RECEIVED

AUG 3 1 2004
A3889-1
Bankston, Gronning, O'Hara, Sedor
Mills, Givens, & Heaphey, P.C.

FILED

AUG 3 0 2004

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

B

# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | |
|---|---|
| AT PUBLISHING, INC., )<br><br>Plaintiff, )<br><br>vs. )<br><br>A.B. DICK COMPANY and )<br>OFC CAPITAL, a division of )<br>ALFA FINANCIAL CORPORATION, )<br><br>Defendants. )<br>_____)<br>OFC CAPITAL, a division of )<br>ALFA FINANCIAL CORPORATION, )<br><br>Counterclaimant, )<br><br>vs. )<br><br>AT PUBLISHING, INC., )<br><br>Counterclaim-Defendant.)<br>_____) | A04-0011 CV (JWS)<br><br>**ORDER FROM CHAMBERS**<br><br>**[Re:   Motions at Docket Nos. 18 and 24]** |

## I.  MOTIONS PRESENTED

At docket 18, defendant and counterclaimant OFC Capital moves for partial

summary judgment on counts I and VII of the plaintiff's complaint and on OFC's

counterclaim, pursuant to Federal Rule of Civil Procedure 56.  At docket 24, plaintiff

EXHIBIT  6
Page  1  of  17

44

and counterclaim-defendant AT Publishing, Inc. opposes the motion and cross-moves
for partial summary judgment on count I.  Oral argument on both motions was heard on
August 20, 2004.

## II.  BACKGROUND

Plaintiff AT Publishing is an Alaska corporation with its principal place of
business in Alaska.[1]  Defendant A.B. Dick is a Delaware corporation that supplies
printing presses, machines, and copiers in Alaska.[2]  Defendant OFC is headquartered
in Georgia[3] and a division of the ALFA Financial Corporation, an Alabama corporation
doing business in Alaska.[4]

On November 8, 2002, Frank P. Martone, AT Publishing's Chief Executive
Officer, signed an A.B. Dick sales order for a system ("press" or equipment") comprised
of a 4995 A-ICS Color Press and a DPM 2340 with ScanMaster System and a second
computer,[5] along with attachments, training, and freight for all the equipment.  The sale
also included a $63,054 charge for the "buy out" of an earlier lease for a press that AT
Publishing previously obtained from A.B. Dick, bringing the bill total to $375,000.[6]  On
November 18, 2002, AT Publishing financed the sale through a Master Lease

---

[1]Amended Compl., doc. 32 at ¶ 1; doc. 8 at ¶ 1; doc. 9 at ¶ 2.

[2]Doc. 32 at ¶ 2; doc. 8 at ¶ 2; doc. 9 at 2; doc. 34 at ¶ 2.

[3]Doc. 18 at 13.

[4]Doc. 32 at ¶ 3; doc. 8 at ¶ 3; doc. 9 at ¶ 1.

[5]Doc. 24 at 2.

[6]Doc. 32 at ¶ 8; doc. 9 at 2, ¶ 5; doc. 11 at ¶ 5; doc. 18 at ¶ 3; doc. 24 at 2-3; doc. 34 at
¶ 8.

-2-

EXHIBIT    6
Page  2  of  17

Agreement (the "Master Lease") with OFC, which included two schedules, both of which Frank Martone signed on behalf of AT Publishing on November 19, 2002.[7]

Plaintiff instituted the present action in the Superior Court for the State of Alaska, Third Judicial District at Anchorage.[8]  Defendant A.B. Dick removed the case to federal court on January 7, 2004.[9]  Plaintiff seeks damages, declaratory relief, and the rescission of contracts with A.B. Dick and OFC for breach of warranty and contract, unconscionability, mistake, and misrepresentation.  Specifically, count I requests a declaratory judgment that AT Publishing has not "accepted," and has in fact rejected, the subject equipment from A.B. Dick and, therefore, has the right to cancel its finance lease agreement with OFC and all related obligations to that company and return the equipment to A.B. Dick.  Count VII requests that the court enjoin OFC from pursuing any legal rights OFC asserts pursuant to provisions in the Master Lease.  Defendant OFC's counterclaim is a breach of contract claim seeking judgment against plaintiff for all amounts recoverable under the Master Lease, and all costs incurred by OFC in enforcing its rights under that contract.  Subsequent to OFC's instant motion, plaintiff filed an amended complaint.[10]

---

[7]Doc. 32 at ¶ 10; doc. 9 at 2, ¶ 4; doc. 11 at ¶ 4; doc. 34 at ¶ 10.

[8]Case No. 3AN-03-08291 CI.

[9]Doc. 1.

[10]Doc. 32.  Plaintiff's claims for relief are listed in a different order than in the initial complaint.  For example, count VII in plaintiff's complaint is count IX in the amended complaint.

EXHIBIT 6
Page 3 of 17

The court's subject matter jurisdiction is based upon the parties' diversity of citizenship.[11]  The amount in controversy exceeds the statutory threshold of $75,000.[12]

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law.  The moving party has the burden of showing that there is no genuine dispute as to material fact.[13]  The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[14]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[15]  All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[16]  However, the nonmoving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[17]

---

[11]*See* 28 U.S.C. § 1332.

[12]Doc. 32 at ¶ 46; doc. 9 at ¶ 3.

[13]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[14]*Id.* at 323-25.

[15]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[16]*Id.* at 255.

[17]*Id.* at 248-49.

EXHIBIT ___6___
Page __4__ of _17_

## IV.  DISCUSSION

OFC requests a judgment that plaintiff is not entitled to cancel or rescind the Master Lease with OFC because, as a matter of both contract and law, it became irrevocable once AT Publishing accepted the subject equipment.[18] Furthermore, OFC argues it was plaintiff who defaulted on the Master Lease by, *inter alia*, failing to pay rent; therefore, it is entitled to judgment in the amount of $501,480.06, plus interest, costs, and attorneys' fees.

AT Publishing responds that it did not accept the press, it timely rejected it; and, consequently, the court should deny defendant's motion and grant plaintiff's cross-motion for partial summary judgment, which seeks an order declaring that AT Publishing properly rejected the equipment and is entitled to cancel the Master Lease. Additionally, AT Publishing claims OFC has miscalculated the amounts due under Schedules One and Two of the Master Lease and incorrectly applied the liquidated damages provision.

OFC emphasizes the fact that plaintiff signed multiple documents indicating its acceptance of the equipment and categorizes plaintiff's controverting evidence as inadmissible hearsay or conclusory allegations unsupported by facts.  OFC claims AT Publishing further breached its contract with OFC by failing to keep the leased equipment in the required condition and points to AT Publishing's insurance claim for damage to the press as evidence of acceptance.  OFC also argues AT Publishing had no right to reject the equipment because the requirements of their contract and the

---

[18]At oral argument, OFC proffers another theory supporting its motion.  *See infra* at p. 7.

EXHIBIT ___6___

Page __5__ of _17_

agreement between AT Publishing and A.B. Dick were satisfied, and a judgment of $501,480.06 is reasonable and proper.  AT Publishing contends its actions were consistent with timely non-acceptance of the equipment, it had a right to reject the equipment because it did not conform to the conditions of either agreement, and its conduct does not imply acceptance.

### A.     Applicable Law

The Master Lease states, in relevant part, that:

> This Lease shall be governed by and construed in accordance with the laws of the State of Georgia.  Lessee agrees that any actions or proceedings to which Lessor is a party arising directly or indirectly from this Lease, shall be subject to the non-exclusive jurisdiction and venue of any state or federal court within the State of Georgia.[19]

The Supreme Court, in *Klaxon Company v. Stentor Electrical Manufacturing, Company*,[20] extended its holding in *Erie Railroad Company v. Tompkins*[21] to conflict-of-law rules.[22]  Alaska courts apply the choice of law rules specified in the Restatement (Second) of Conflict of Laws (the "Restatement").  The Restatement generally provides that when parties choose a particular state to govern their contractual rights that state's law applies.[23]  The parties do not dispute the application of Georgia law.  In any event,

---

[19]Doc. 18, ex. 1, attach. B, Master Lease at ¶ 23.

[20]313 U.S. 487, 496 (1941).

[21]304 U.S. 64 (1938).  The Court held that "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." *Id.*, at 78.

[22]*Klaxon*, 313 U.S. at 496.

[23]RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 187 and 188.  *See also Long v. Holland Am. Line Westours, Inc.*, 26 P.3d 430, 432 (Alaska 2001); *Palmer G. Lewis Co. v. Arco*



EXHIBIT ___6___

Page __6__ of __17__

both Alaska and Georgia have adopted Article 2A of the Uniform Commercial Code, which is pertinent to the instant issues.[24]

### B.    Partial Summary Judgment Motions

The parties' briefs focus on the issue of acceptance pursuant to the U.C.C. and the Master Lease.  However, at oral argument, OFC argued that AT Publishing's liability arose upon execution of the Master Lease and the accompanying Schedules. Specifically, OFC contends that the U.C.C.'s acceptance definition is not applicable because AT Publishing overtly accepted the equipment when it signed the Delivery and Acceptance Receipts (the "Receipts") in November, 2002, and again in March, 2003, when it signed A.B. Dick's Installation Activation Certificate (the "Certificate").  AT Publishing responds that the U.C.C. applies, and it did not have a "reasonable opportunity" to inspect the subject equipment; therefore, it did not accept the equipment, but timely rejected it.

OFC relies on the Georgia Appellate Court's opinion in *Moreland Auto Stop, Inc. v. TSC Leasing Corporation* to support its position.[25]  There, a computer lessor sued the lessee for breach of a lease agreement.  The entire computer system was delivered and partially installed when the lessee executed the certificate of acceptance

---

*Chem. Co.*, 904 P.2d 1221, 1227 (Alaska 1995).

[24]*Colonial Pac. Leasing Corp. v. McNatt*, 486 S.E.2d 804, 807 (Ga. 1997).  *See* GA. CODE ANN. §§ 11-2A-101 *et seq.  See also* AS §§ 45.12.101 *et seq.*

[25]454 S.E.2d 626 (Ga. Ct. App. 1995).

EXHIBIT____6____
Page _7__ of _17_

"acknowledging delivery, inspection and acceptance of the system . . . 'for all purposes under [the lease] and [that it] is subject to all terms and conditions of the Lease.'"[26] After more than a month of unsuccessful attempts to install the remaining equipment, the lessee shipped the system back to the lessor. The lessor sold the equipment at a loss and sued the lessee for the deficiency. The lessee argued that the parties intended the lease to commence upon installation of the equipment. However, the court found that "the lease clearly provides that it would 'commence on the date of acceptance of this Lease as set forth in the relevant Certificate of Acceptance,'" the lessee signed the certificate, and the parties did not intend paragraph 5[27] to act as a condition precedent.[28] Therefore, the court concluded that the lease commenced pursuant to the lease terms—on the date the lessee signed the Certificate of Acceptance.

The facts in *Moreland* are distinguishable. Here, paragraph five of the Master Lease states that "[w]ithin ten (10) days following the delivery of *substantially all* of the Equipment to Lessee, Lessee shall furnish to Lessor an executed Delivery and Acceptance certificate (on Lessor's standard form), or shall deliver to Lessor written notice of any proper objection to the Equipment."[29] It is undeniable that AT Publishing

---

[26]*Id.* at 627.

[27]Paragraph 5 provided: '[u]pon receipt (and installation, if applicable) of the Equipment from the Supplier . . . Lessee shall furnish Lessor [with a certificate of acceptance]." *Id.* at 627-28.

[28]*Id.* at 628.

[29]Doc. 18, ex. 1, attach. B (emphasis added).

EXHIBIT 6
Page 8 of 17

signed two Receipts[30] on November 19, 2002.  However, the equipment was not

delivered in November 2002; rather, partial delivery occurred in March 2003.[31]  Although

the Receipts were designed to be signed after the equipment was delivered, the fact

that AT Publishing signed them before the financing application process was

complete,[32] and that OFC knew the equipment had not in fact been delivered,[33] means

the documents are not what they purport to be and should not be taken at face value.[34]

Furthermore, subsequent to Frank Martone's signing the Receipts, OFC did not

demand payment and does not provide evidence that it considered the signed Receipts

to effect commencement of the lease.  On the contrary, OFC avers that "[a]ccording to

the terms of OFC's standard lease agreement, lease payments are not due until the

customer accepts the equipment,"[35] and it is the company's "policy to verbally confirm

all of its lease agreements and the acceptance of the leased equipment before

demanding payment under them. . . . Only when the lessee confirms the delivery and

installation of equipment and authorizes payment to the supplier does OFC complete

_____

[30]*Id.*, attachs. E and F (a receipt was signed for Schedule 1 and Schedule 2).

[31]Doc. 24, aff. of Frank P. Martone at ¶¶ 6 and 12.

[32]As of December 2, 2002, OFC was still requesting information it needed from AT
Publishing to complete the lease agreement file.  Doc. 24, aff. of Frank P. Martone, exs. C and
E.

[33]Doc. 24, ex. 2; *id.*, aff. of Frank P. Martone, ex. F.

[34]OFC's argument that AT Publishing waived its right to reject the equipment by signing
the Receipts is not persuasive.  AT Publishing's acts do not show a "voluntary and intentional
relinquishment of a known right."  *See Shaps v. Provident Life & Acc. Ins. Co.*, 244 F.3d 876,
877 (11th Cir. 2001).

[35]Doc. 18, ex. 1, decl. of Carolyn McClain at ¶ 3.

EXHIBIT 6
Page 9 of 17

payment to the supplier and begin to seek payments from the lessee."[36]  The Master Lease supports Ms. McClain's testimony:  "Lessor shall notify Lessee . . . of the date on which the first lease payment . . . is due, which date shall be the date on which substantially all of the Equipment has been delivered to Lessee."[37]  Moreover, the Master Lease states that "[t]he terms of this Lease shall commence on the date of full execution."[38]  OFC states that "[t]he Master Lease, Schedule 1, and Schedule 2 were all executed by Frank P. Martone, Plaintiff's Chief Executive Officer, on November 19, 2002 and by Michael T. Kane, OFC's Chief Financial Officer, on March 24, 2003."[39]  Therefore, full execution of the Master Lease occurred on March 24, 2003.  The provisions in the Master Lease and OFC's business practices do not support OFC's contention that AT Publishing's signature on the Receipts commenced AT Publishing's lease obligations.

Alternatively, OFC argues that Andrew Martone's[40] March 6, 2003 signature on the Certificates started AT Publishing's lease obligations.  Again, the evidence does not support OFC's contention; rather, it shows that OFC considered March 24, 2003 the lease commencement date: OFC executed the Master Lease and Schedules on March 24, 2003, and the alleged phone call by Ms. McClain to AT Publishing occurred on the

---

[36]*Id.* at ¶ 9.

[37]Doc. 18, ex. 1, attach. B at ¶ 3.

[38]*Id.*, at ¶ 2.

[39]Doc. 18 at 5. Plaintiff agrees with the November 19, 2002 signature date.  *See* doc. 24, aff. of Frank P. Martone at ¶ 3.

[40]Andrew Martone is the President of AT Publishing.

EXHIBIT 6
Page 10 of 17

same date.  The terms in the Master Lease arguably support a March 24, 2003 lease commencement;[41] however, Frank Martone states that OFC was calling on approximately a bi-monthly basis, and that he "repeatedly told the callers that the equipment had not yet arrived."[42]  Frank Martone avers in his affidavit that he does not remember the March 24, 2003 phone call from Ms. McClain, however, he maintains he "never told anyone from OFC Capital that the 4995 Press was working properly."[43]

The Master Lease is a finance lease, and, as such, the lessor does not incur warranty liability to the lessee.[44]  Furthermore, according to the terms of the Master Lease, the equipment's condition and operation does not affect the lessee's obligation to make payments:

> Lessee further acknowledges that Lessor has not made and does not make any warranty or representation, either express or implied, . . . as to the fitness, condition, merchantability, design or operation of the Equipment, its fitness for any particular purpose, the quality or capacity of the materials in the Equipment or workmanship in the Equipment, . . . nor any other representation or warranty whatsoever. . . . No defect or unfitness of the Equipment . . . shall relieve Lessee of the obligation to

---

[41]In oral argument, AT Publishing conceded that the court can consider A.B. Dick's Certifications in the same context as OFC's Delivery and Acceptance Receipts.  The court notes that A.B. Dick forwarded the signed Certifications to OFC on March 11, 2003.  *See* doc. 18, ex. 1, decl. of Carolyn McClain at ¶ 8.

[42]Doc. 24, aff. of Frank P. Martone, at ¶ 16.

[43]*Id.*

[44]*See, e.g., Gen. Elec. Capital Corp. v. Nat'l Tractor Trailer Sch., Inc.*, 667 N.Y.S.2d 614, 618-19 (N.Y. Sup. Ct. 1997).  *See also* 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 13-3 (4th ed. 1995);  UNIF. COMMERCIAL CODE §§ 2A-212 and -213, 1B U.L.A. 656 (1989) ("U.L.A.") (These sections exclude finance leases from the implied warranties of merchantability and fitness.  The corresponding Georgia statutes follow the Uniform Code's language).

EXHIBIT __*B*__

Page __11__ of __17__

pay an Lease Payment or any other obligation hereunder or under any Schedule.[45]

However, AT Publishing asserts that the U.C.C. provides protections, which the court must consider before concluding acceptance occurred.[46] AT Publishing claims that it did not accept the equipment under the U.C.C. definition of acceptance. While Article 2A provisions preserve the parties' freedom of contract,[47] courts have recognized the U.C.C.'s application.[48]

Pursuant to the U.C.C.'s "hell or high water" provision,[49] the contract becomes irrevocable upon the lessee's acceptance of the product(s). The U.C.C. defines "acceptance" as follows:

---

[45]Doc. 18, ex. 1, attach B. at ¶ 4 (emphasis omitted).

[46]*See, e.g.*, U.L.A. § 2A-301 ("*Except as otherwise provided in this Article*, a lease contract is effective and enforceable according to the terms between the parties") (emphasis added).

[47]U.L.A., § 2A-102 cmt. at 656.

[48]*Tri-Continental Leasing Corp. v. Law Office of Richard W. Burns*, 710 S.W.2d 604, 608 (Tex. Ct. App. 1986); *Colonial Pac. Leasing*, 977 P.2d at 544-48; *Moses v. Newman*, 658 S.W.2d 119, 121-22 (Tenn. Ct. App. 1983); *Gen. Elec. Capital*, 667 N.Y.S.2d at 620; *but see JAZ, Inc. v. Foley*, 85 P.3d 1099, 1102 (Haw. Ct. App. 2004) ("court will look to the terms of the Master Lease before applying the UCC-Leases provisions").

[49]GA. CODE ANN.§ 11-2A-407. This section provides in part: "(1) In the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods." *See also* GA. CODE ANN. § 11-2A-516, which provides in relevant part:
(1) A lessee must pay rent for any goods accepted in accordance with the lease contract, with due allowance for goods rightfully rejected or not delivered. (2) A lessee's acceptance of goods precludes rejection of the goods accepted . . . . (3) If a tender has been accepted: (a) Within a reasonable time after the lessee discovers or should have discovered any default, the lessee shall notify the lessor and the supplier, if any, or be barred from any remedy against the party not notified[.]



EXHIBIT 6
Page 12 of 17

> (1) Acceptance of goods occurs after the lessee has had a *reasonable opportunity* to inspect the goods and
> (a) The lessee signifies or acts with respect to the goods in a manner that signifies to the lessor or the supplier that the goods are conforming or that the lessee will take or retain them in spite of their nonconformity; or
> (b) The lessee fails to make an effective rejection of the goods.[50]

"Rejection of goods is ineffective unless it is within a *reasonable time* after tender or delivery of the goods and the lessee seasonably notifies the lessor."[51] Many jurisdictions have held that "[t]he UCC definition of a reasonable time suggests that the question of reasonableness is particularly fact sensitive. It follows that '[w]hether conduct has amounted to an acceptance or a rejection of goods is a question of fact 'to be determined within the framework of the facts of each particular case.'"[52] Here, the parties submit conflicting testimony regarding the acceptance and/or rejection of the subject equipment.[53]

AT Publishing also contends that the court should supplement the limited case law interpreting the applicable sections in Article 2A with cases analyzing the analogous

---

[50]GA. CODE ANN. § 11-2A-515(1) (emphasis added).

[51]GA. CODE ANN. § 11-2A-509(2) (emphasis added).

[52]*Sjogren v. Maybrooks, Inc.*, 573 N.E.2d 1367, 1369 (Ill. App. Ct. 1991) (internal citations omitted); *Amatulli Imports, Inc. v. House of Persia, Inc.*, 383 S.E.2d 192, 194 (Ga Ct. App. 1989); *Trailmobile Div. of Pullman, Inc. v. G.M. Jones*, 164 S.E.2d 346, 348 (Ga. Ct. App. 1968) ("[w]hat is a reasonable time is ordinarily a matter of fact to be determined by a jury under the particular circumstances of the case") (citation omitted); *Colonial Pac. Leasing*, 977 P.2d at 544 (and cases cited therein). *See also* GA. CODE ANN. § 11-1-204(2) ("What is a reasonable time for taking any action depends on the nature, purpose, and circumstances of such action.").

[53]*See, e.g.*, doc. 18, decl. of Carolyn McClain at ¶ 11; doc. 24, aff. of Frank P. Martone at ¶¶ 12 and 20; doc. 24, aff. of Andrew Martone at ¶¶ 3 and 4.



EXHIBIT _6_
Page _13_ of _17_

sections in Article 2.[54]  There is support for AT Publishing's suggestion.[55]  At oral

argument, AT Publishing's counsel claimed Georgia courts have concluded that

delivery, lease payment, and simple installation is not indicative of acceptance.[56]  He

further stated that the referenced cases included warranty disclaimers in the subject

agreements.  Counsel's representation is not completely accurate:  The three cases he

cited neither address a warranty disclaimer provision nor are they Georgia decisions.[57]

However, the cases do analyze and apply the U.C.C.'s "reasonable opportunity to

inspect" provision to determine whether the lessee or buyer accepted the goods at

issue.  The Texas appellate court, in *Tri-Continental Leasing*, relied on U.C.C. lease

provisions even though the lease contract included disclaimers,[58] and the lessee

executed a Delivery and Acceptance Certificate.  The court found that the U.C.C.'s

---

[54]GA. CODE ANN. § 11-2A-515 (acceptance) is similar to § 11-2-606.

[55]*See, e.g., Colonial Pac. Leasing*, 977 P.2d at 544 (citing with approval 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE §§ 14-1 and -2 (4th ed. 1995) ("Usually the lessee is treated somewhat like a buyer of goods and the lessor somewhat like a seller. . . . Section 2A-508 through 2A-517 are relatively straightforward modifications of the Article 2 rules on rejection, cure, revocation, acceptance and the like."); UNIF. COMMERCIAL CODE § 2A-102, 1B U.L.A. 656 (1989) ("the provisions of the Article on Sales (Article 2) have been applied by analogy to leases of goods").

[56]Specifically, counsel proffered the following decisions: *Capital Dodge Sales, Inc. v. N. Concrete Pipe, Inc.*, 346 N.W.2d 535 (Mich. Ct. App. 1984); *Moses v. Newman*, 658 S.W.2d 119 (Tenn. Ct. App. 1983) and *Colonial Pac. Leasing Corp v. J.W.C.J.R Corp.*, 977 P.2d 541 (Utah Ct. App. 1999).

[57]*See* n. 56 *supra*.

[58] Important to the court's analysis was the trial court's conclusion that the written disclaimer provision was unconscionable.  710 S.W.2d at 607.

-14-

EXHIBIT __6__
Page _14_ of _17_



"reasonable opportunity to inspect the goods" principle applied to the leasing of equipment.[59]

Here, the signed Receipts fail to establish acceptance under the U.C.C.  When Frank Martone signed the Receipts, AT Publishing did not have possession of the equipment;[60] therefore, it did not have a "reasonable opportunity to inspect the goods." While Georgia courts do not appear to have dealt with a similar situation, many other courts have, and the consensus is that signing an acceptance certificate prior to the actual receipt of the equipment does not mean a lessee has accepted the goods.[61]

Andrew Martone—President of AT Publishing— claims the equipment was not fully installed or operational when he signed the Certificate for the Four Color Press and its related accessories on March 6, 2003.[62]  Furthermore, Andrew Martone explains that he signed the Installation Certificate at the request of A.B. Dick representatives even though he "did not have the opportunity to inspect the equipment," because "one of [them] said that [Mr. Martone's] signature meant only that the listed equipment had been delivered."[63]  OFC argues that the representative's statement is hearsay.  The court disagrees.  Hearsay is an out-of-court statement offered to prove the truth of the

---

[59]*Id.* at 608.

[60]The U.C.C. assumes "[p]ossession during the time necessary for the 'reasonable opportunity' to inspect.  *Capital Dodge Sales*, 346 N.W.2d at 539.

[61]*See, e.g., JAZ*, 85 P.3d at 1103-04 (and cases cited therein); *Colonial Pac. Leasing*, 977 P.2d at 543-45 (and cases cited therein); *Tri-Continental Leasing*, 710 S.W.2d at 608.

[62]Doc. 18, ex. 1, attach. G; doc. 24, aff. of Andrew Martone, ex. A.

[63]Doc. 24, aff. of Andrew Martone, ¶ 4.

-15-

EXHIBIT___ b
Page 15 of 17

matter asserted.[64]  Statements offered solely for the fact that they were made and the effect they have upon the person who heard them are excluded from the hearsay rule.[65] Here, Andrew Martone explains that he signed the Installation Certificate because of the representative's alleged statement—it is inconsequential whether the statement's substance is in fact true.

When AT Publishing signed the Certificates, it did not have all of the equipment and what was delivered was not installed; therefore, at the time of signature AT Publishing did not have a reasonable opportunity to inspect the equipment. Controverted facts exist as to when or if AT Publishing had a reasonable opportunity to inspect the subject equipment.[66]

OFC argues that AT Publishing's conduct subsequent to the delivery of the equipment establishes that it has accepted the equipment.  The court finds, however, that the conduct is not dispositive.  To a substantial degree, it is as consistent with rejection of what was actually provided as it is indicative of acceptance of what was actually delivered.  OFC argues that it is not subject to any warranty regarding the suitability of the equipment for AT Publishing's purpose.  That is correct, but it does not compel characterization of AT Publishing's activities as acceptance of the equipment. Rather, the court concludes that genuine issues of material fact are present regarding

---

[64]FED. R. EVID. 801.

[65]30B MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 7005 at 46-66.

[66]See doc. 18 at 17 (In response to the U.C.C.'s "reasonable opportunity to inspect" language, OFC states that "Plaintiff had the Equipment in November 2002 and it was completely installed in early March 2003"); see doc. 24, aff. of Frank P Martone at ¶ 20 ("I have informed A.B. Dick and OFC Capital numerous times that I did not accept the 4995 Press."); see also n. 33 supra.

-16-


EXHIBIT  6
Page  16  of  17

whether AT Publishing accepted or rejected the subject equipment.  Resolution of the

pertinent issues necessarily involves an analysis of specific facts surrounding the

"reasonableness" of AT Publishing's opportunity to inspect and rejection of the

goods—quintessential jury questions.

## V.  CONCLUSION

For the aforementioned reasons, defendant and counterclaimant OFC's motion

for partial summary judgment at docket 18 is **DENIED** and plaintiff and counterclaim-

defendant AT Publishing's cross-motion for partial summary judgment at docket 24 is

**DENIED**.

DATED at Anchorage, Alaska, this 27th day of August 2004.

JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

A04-0011--CV (JWS)      8-30-04
-------------------------------------------------
R. WEDDLE (HOLMES)
P. GILMORE (ATKINSON)
M. MILLS

-17-

EXHIBIT    6
Page  16  of  17