Randall J. Weddle, Esq.
HOLMES WEDDLE & BARCOTT, PC
701 W. 8th Avenue, Suite 700
Anchorage, Alaska 99501
Phone: (907)274-0666
Fax: (907)277-4657

Marion F. Walker
FORD & HARRISON LLP
2100 Third Avenue North, Suite 400
Birmingham, Alabama  35203
Phone:      (205) 244-5916
Fax:        (205) 244-5901

Attorney for Defendant OFC Capital, a division of ALFA Financial Corporation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| AT PUBLISHING, INC.,           ) | |
|                         ) | |
|     Plaintiff,           ) | |
|                         ) | |
| v.                                         ) | Case No. 3:04-cv-0011-JWS |
|                         ) | |
| A.B. DICK COMPANY and OFC   ) | |
| CAPITAL, a division of ALFA      ) | |
| FINANCIAL CORPORATION,     ) | |
|                         ) | |
|     Defendants.         ) | |

### OFC CAPITAL'S REPLY TO AT PUBLISHING REPLY TO OFC CAPITAL'S OBJECTIONS AND COUNTER-DESIGNATIONS TO OFC'S COUNTER-DESIGNATIONS OF TESTIMONY

COMES NOW OFC CAPITAL, and for Reply as set forth above, says as follows:

1.  The AT Publishing Exhibits 1-5 are polyester plates, paper "waste", a color test sheet and test sheet, none of which are further identified by date created, by whom created, or the purpose they were created. At the conference the attorneys had about exhibits, AT Publishing's attorneys did not know anything further about the exhibits besides their existence in a number of boxes. Clearly, AT Publishing attorneys have known about them for several years.

OFC Capital's attorney takes umbrage at the claim of "disingenuousness" leveled by AT Publishing. If the things represented by Exhibits 1-5 are indeed documents responsive to the No. 6 request[1] filed by OFC Capital on February 15, 2006, as claimed in the AT Publishing response filed March 21, 2006, after the discovery period ended in this case, and, if the documents are supportive of any claims AT Publishing set out against OFC Capital in the complaint filed in June 2003, then they would have been listed and/or provided with Plaintiff's Initial Disclosures

---

[1] The request asks for "any and all sheets of paper ATP kept from the operation of the 4995 press during the training Ray Seaward provided in March 2003."

(attached) dated April 24, 2004. There were not identified at that time, nor were the FRCP Rule 26 disclosures supplemented, and possession of these things was not mentioned at the deposition of Ray Seaward within days of the service of the request.

Without the appropriate and timely disclosure of these things, or a chance to ask Ray Seaward about them, AT Publishing seeks to ambush OFC Capital with issues and documents never contemplated as relevant to claims it brought in the case. It does not matter that AT Publishing disclosed the things in its impermissibly late response to discovery requests, or right before trial, because OFC Capital is effectively denied its right to ask about the things before trial. As a matter of fact, counsel for OFC Capital mentioned the requests to counsel for AT Publishing during the February 2006 depositions of former A.B. Dick employees and received the off-handed directive that the responses would be provided within the time allowed.

AT Publishing attorneys at the time of Ray Seaward's deposition knew he was not expected to appear at trial, apparently knew they had documents and the things covered by the proposed Exhibits 1-5, and kept them to themselves until discovery was over. At this point, AT Publishing

expects to present Exhibits 1-5, which are not relevant to claims by or against OFC Capital, and are hearsay without an exception as to OFC Capital. OFC Capital objects to these exhibits and any irrelevant and hearsay testimony that may be offered with them.

The AT Publishing agreement regarding relevancy of these things because of its perception that the issue of acceptance/rejection arises from the fact *vel non* of the delivery of "conforming goods," fails for the falsity of its underlying premise. The factual issue as to whether AT Publishing had a sufficient opportunity to test and inspect the equipment, has nothing to do with whether the equipment was in fact "conforming." Hence, no evidence as to whether the equipment conformed to representations and expectations between AT Publishing and A.B. Dick, which is hearsay without an exception to OFC Capital, is admissible, at least, not fairly admissible against OFC Capital. There are two reasons for such a ruling: one is contractual and the other evidentiary.

ONE. The Master Lease is undisputedly a valid contract controlling the legal rights, obligations and dealings between AT Publishing and OFC Capital. In Paragraph 1 on page 1, the parties agree the Master Lease is a finance lease and agree in Paragraph 4, page 2, as follows:

> Lessee acknowledges that Lessor is not the manufacturer of the Equipment nor the manufacturer's agent or dealer. Lessee further acknowledges that it has selected the Equipment listed in each Schedule and has made all determinations as to the size, design and capacity thereof, and that Lessee has selected the Supplier from whom Lessor is to purchase the Equipment. **LESSEE FURTHER ACKNOWLEDGES THAT LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, OF ANY KIND WHATSOEVER AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF THE EQUIPMENT, ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE QUALITY OR CAPACITY OF THE MATERIALS IN THE EQUIPMENT OR WORKMANSHIP IN THE EQUIPMENT, THE ABSENCE OF LATENT DEFECTS, THE ABSENCE OF PATENT OR OTHER INFRINGEMENT, LESSOR'S TITLE TO THE EQUIPMENT, COMPLIANCE OF THE EQUIPMENT WITH GOVERNMENTAL OR LEGAL REQUIREMENTS, NOR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER.** . . . No defect or unfitness of the Equipment at any time shall relieve Lessee of the obligation to pay any Lease Payment or any other obligation hereunder or under any Schedule.

The AT Publishing reference to "what the parties agree" to is not complete but refers to the quote from *Colonial Pacific Leasing Corp. v. J.W.C.J.R. Corp.*, 977 P. 541, 545 (1999) addressing when "acceptance" occurs pursuant to UCC 2A-515, and actually cites the annotated Utah Code that explains the UCC section as follows:

> (1) Acceptance of goods occurs after:

OFC CAPITAL'S REPLY TO AT PUBLISHING REPLY TO OFC CAPITAL'S OBJECTIONS AND COUNTER-DESIGNATIONS TO OFC'S COUNTER-DESIGNATIONS OF TESTIMONY
Case No. 3:04-cv-0011-JWS
Page 5 of 18

> *(a) the lessee has had a reasonable opportunity to inspect the goods and the lessee signifies or acts with respect to the goods in a manner that signifies to the lessor or the supplier that the goods are conforming or that the lessee will take or retain them in spite of their nonconformity*; or
>
> (b) the lessee fails to make an effective rejection of the goods as provided in Subsection 70A-2a-509(2).

977 P. 2d 541, 544 (emphasis in original).

The only legitimate issues in this case go to whether the facts in the case satisfy the above. AT Publishing erroneously interprets the phrase "lessee signifies or acts with respect to the goods in a manner that signifies to the lessor that the goods are conforming . . . ." as creating a fact question regarding the actual conformity. The law addresses actions by the lessee to the lessor, and not the actual condition of the goods that, as between the lessee and lessor, only the lessee would know.

TWO. The things represented by Exhibits 1-5 may be items that result from the normal operation of the equipment, may, or may not, have been created when Ray Seaward was training in March 2003, but AT Publishing cannily dealt with the things, so that only their representatives will be able to testify to and about them, and OFC Capital must stand helplessly before the jury that will be asked to believe OFC Capital had

some culpability in AT Publishing's inability to operate the equipment, or dashed expectations about how it worked. The Federal Rules of Civil Procedure, Rules 1 and 26, and the Federal Rules of Evidence, Rules 801 and 802, and 401-403 do not countenance.

Lastly, there is no issue in the case, as AT Publishing claims in its Reply at page 2, "whether or not it [equipment] produced the quality product that it was represented to produce." OFC Capital has no way at all to defend against claims brought against AT Publishing's supplier. OFC Capital contends AT Publishing's proposed Exhibits 1-5 are not relevant, are hearsay to OFC Capital, and their admission will confuse the jury and unfairly and irreparably prejudice OFC Capital.

2.  <u>AT Publishing Exhibits 11-25; 36-39; 40 and 41 – Indigo Press</u>.

In its Reply and at trial, AT Publishing wants to tell the court and jury "why" it decided to purchase the 4995A press and DPM2340 by describing its "market needs," expectations and its problems with a prior press it purchased from A.B. Dick. None of this information was ever shared with OFC Capital, nor was OFC privy to any conversations of AT Publishing with its supplier, A.B. Dick. Any A.B. Dick recommendations, representations, or prior experiences the parties had, do not have any

relevance to the legal rights and obligations between OFC and AT Publishing that arise from the Master Lease and equipment schedules.

"A.B. Dick" did not agree "to take back" the Indigo press, as AT Publishing claims on p. 4 of its Reply, because A.B. Dick Capital, a separate company, held the lease on the Indigo press and OFC Exhibit RRR is Frank Martone's request for a pay-off amount. Rather than write a check for the pay-off, AT Publishing wanted to include the amount in a new lease. OFC Capital was not a part of any conversation where A.B. Dick may have referred it to AT Publishing, so admission of such conversations or exhibits relating to them, are a violation of FRE 801-802, and 401-403.

It does not matter why Frank Martone, an admittedly successful and sophisticated businessman with 43 years of experience with finance leases, chose OFC Capital to finance his purchase of the equipment AT Publishing wanted to buy. He may have been able to go to his bank to do the transaction, or it may be he knew most banks would not give him a finance lease where the pay-out for other equipment was included. The fact this pay-out amount is included in the amount OFC claims under the Master Lease and Lease Schedules is irrelevant, because Frank Martone for AT Publishing asked OFC to finance the sum. AT Publishing has never claimed

in this lawsuit that it does not specifically owe the pay-off amount because the Indigo press did not meet its expectations, so no particular relevance attaches to the transaction involving that press.

AT Publishing's argument for the relevance of these Exhibits pertaining to the Indigo press and, presumably, for the hearsay conversations surrounding them, at p. 5 of its Reply, is merely an attempt to overlay the delivery, acceptance, training and acceptance of the lease with suspicions and an enhanced degree of care by AT Publishing the facts do not bear out. The mere fact that there was a prior press – which OFC knew, and there was a letter demanding payment under the lease for the press to Edna Martone, and that there was a request for a pay-off by Frank Martone, is sufficient to explain for the jury the amount financed because of the Indigo press, and show the Martone's experience with and knowledge of finance leases.

AT Publishing counsel's "bewilderment" (Reply, p. 6) is easily explained by his error in taking OFC's agreement to substitute its Exhibits BB and DD for AT Publishing's 15 and 24, as agreement to their admissibility. However, with some time to reflect as case preparation continues, OFC agrees Exhibit 15, erroneously described in AT Publishing's

Exhibit List, is due to be admitted for the limited purpose and reason stated below.

Exhibits RRR and SSS are the demand and request. Exhibit 5 is a January 25, 2002 letter from the A.B. Dick Northwest District Service Manager that refers merely to the "Color Press" and reflects the care in planning for training, the anticipated skills of the person to be trained, and the time requirements of the person to be trained. The document's relevancy lies, not with the fact it was sent ahead of training on the Indigo press, but because it shows Frank Martone was on notice about the training requirements and expectations of A.B. Dick before Burt Green and Ray Seaward provided training on the equipment at issue in 2003. The manner in which AT Publishing approaches the training provided by A.B. Dick has a bearing on the opportunity it was afforded to test and inspect the equipment.

Exhibit 24 is a letter directly related to the conditions needed for the Indigo press to operate as expected. The information in the letter has no bearing whatever on the facts incident to the issue of AT Publishing's opportunity to inspect and test the equipment and is hearsay as to OFC Capital.

3.    AT Publishing Exhibits 6-10; 47-58; 74-81.

The three issues created by the AT Publishing agreement for these exhibits are: whether OFC had a duty to tender conforming goods to ATP; whether A.B. Dick was an agent of OFC; and whether the goods were in fact conforming. The answers to these questions are: no, no, and not relevant and hearsay.

Despite its assertion on p. 6 of its Reply, AT Publishing has never claimed a duty, and in fact, signed the Master Lease which specifically provides that OFC has no duty at all with regard to the equipment, except to order and pay for it. OFC fulfilled both of these obligations, in effect, for and on behalf of AT Publishing. Paragraph 5 **DELIVERY AND ACCEPTANCE** of the Master Lease states:

> If, prior to entering into a Schedule hereunder with respect to specific items of Equipment, Lessee has entered into a Supply Contract for such Equipment, Lessee shall assign its rights under such Supply Contract to Lessor in connection with the execution of the Schedule. In all other circumstances, Lessee authorizes Lessor to enter into a Supply Contract for the Equipment. Lessee shall arrange directly with the Supplier for delivery and acceptance of the Equipment in accordance with the Supplier's requirements. Lessee shall inspect the equipment promptly upon delivery. . . . In the event that Lessee rejects, objects to or fails to accept delivery of any item of the Equipment, Lessee shall indemnify Lessor and hold Lessor

> harmless from and against any and all claims of
> the Supplier asserted in connection therewith.

AT Publishing signed the Sales Order (Exhibit EEE) with A.B. Dick to purchase the equipment ten days before it executed the Master Lease and Lease Schedules with OFC. A.B. Dick was selected by AT Publishing, not OFC, as the supplier of equipment. In one sentence AT Publishing claims OFC was obligated to tender conforming goods, and in the next admits OFC has no knowledge about the goods, or ability to tender them, nor knowledge to know if AT Publishing received "conforming goods." (Reply, pp. 6-7) OFC certainly had to rely upon another to know if the goods were acceptable, but the reliance was on AT Publishing, not A.B. Dick.

An agency relationship is not created merely because two entities have a history of doing business for mutually exclusive profit. Besides the bald and bold claim of agency, AT Publishing failed to allege initially, or demonstrate even one legally competent fact that suggests OFC and A.B. Dick had an agency relationship with respect to the AT Publishing equipment. On the contrary, the plain wording of their Master Lease, makes clear OFC was taking action for AT Publishing and relied upon AT Publishing to tell OFC if the equipment was not acceptable, whether it was conforming or not.

The alleged "rejection" AT Publishing refers to at p. 7 of its Reply was a letter its lawyer sent in June 2003, 53 days after Greg Martone had already admitted AT Publishing had a lease on the equipment, and 70 days after Frank Martone told OFC to begin the lease. Such an attempt at rejection is not before "the time for performance" expired, nor seasonably made as required by UCC § 2A-513 cited at p. 7 of the Reply. AT Publishing was required to tell OFC whether it wanted to go through with the lease on the equipment within ten days of delivery, but OFC did not even call for a final authorization to proceed until 17 days after AT Publishing signed the A.B. Dick delivery and acceptance certificate. It is true OFC received a copy of many letters exchanged between AT Publishing and A.B. Dick attorneys referring to tests and cures after June 2003. However, by that time, AT Publishing had filed suit, even though the suit was not served until December, 2003, against A.B. Dick and OFC, forestalling further collection efforts of OFC. The communications between the buyer and supplier of the equipment was an effort to settle their dispute: OFC was protected by its Master Lease, Lease Schedules and their acceptance by Frank Martone for AT Publishing. AT Publishing knew by that time it had a lease with OFC

and knew OFC was trying to collect, so trying to argue any "cure" or settlement discussions is not relevant to OFC's claims.

The argument of AT Publishing on these exhibits verges on fantasy born of a desperate lack of effective defenses to OFC's claim of breach of contract. The court, in its Order denying summary judgment, directed the focus of the issue in the case to the opportunity to test and inspect afforded AT Publishing before acceptance was made, or before it occurred by the terms of the lease. Rather than address this issue, AT Publishing continues to try and change the issue, obfuscate, and provide excuses, not defenses.

As to Exhibit 57, it may be attached to another exhibit, but, standing alone, OFC maintains its relevance and hearsay objections.

As to Exhibit 81, OFC insists upon its objection because the document follows the relevant March-April 2003 time period during which delivery, installation, training, an opportunity to test and inspect and acceptance occurred. Moreover, the financials for the holding company for A.B. Dick four months after the acceptance of the lease is not relevant to any issue, and the lawsuit had been filed by that time.

OFC does not agree Exhibit 58 was agreed to in the parties' meeting, and AT Publishing counsel could be confused, since AT Publishing did not

provide a list at the meeting, but relied upon OFC's paralegal to write and type one up for AT Publishing. However, OFC will withdraw its objection to Exhibit 58, but reserves all objections to any testimony about it at trial.

### Reply to Objections of Tad Graham Designations

Page 12, line 12 – Page 12, line 25 – This is a question asked by AT Publishing's attorney and was rephrased from the question included in lines 1-11 which OFC will now designate and in order for the question to be unambiguous. The question is relevant to the "training" that AT Publishing claims Tad Graham received on the 4995A press. This was claimed in response to an interrogatory and was later addressed by Tad Graham in his testimony, as well as by Ray Seaward. The testimony is relevant to AT Publishing's opportunity to train on and test the equipment prior to the time of the March 24th acceptance.

Page 13, line 9 – line 24 – The question is asked by AT Publishing's attorney so objection to leading is not appropriate. The question is relevant to training as discussed above and for the same reason.

Page 19, line 3 – Page 20, line 10 – The relevance of this inquiry regarding Mr. Graham's use of polyester plates and his frank preference with the metal plates over the polyester, goes to the issues AT Publishing faced with its employees creating polyester plates appropriately on the DPM and also goes to attest to the fact AT Publishing was using the DPM and continued to use it even though they did not pay for it. The foundation is: this is a witness called by AT Publishing and a former employee of AT Publishing, and he operated the two color press that also required plates, so a question regarding the DPM is appropriately asked.

Page 21, line 15 – Page 22, line 1 – Leading is not an appropriate objection to a witness called by AT Publishing to questions asked by OFC. OFC denies that the previous testimony was mischaracterized and adding this testimony to that designated by AT Publishing makes the inquiry complete.

Page 22, line 3 – line 15 – Foundation is provided in that the witness is a former employee of AT Publishing and questions and answers have to do with what he observed.

Page 23, line 5 – line 21 – This testimony is relevant concerning Mr. Graham's desire to remain in the room by himself running the two color press and his desire not to give that up and train on the four color press. This testimony is significant because he was the most qualified person to be trained on the four color press and was not turned over to Ray Seaward for training.

Page 26, line 25 – Page 28, line 1 and Page 28, line 15 – Page 29, line 21 – There is certainly an appropriate foundation for Mr. Graham to speak about his experience at AT Publishing with the purchase of the two color press and the process that was used to purchase it, as well as his experience as a pressman as to how long it would take, after a press was running, for a pressman to tell if it is what he wanted or not.  Moreover, Mr. Graham is testifying as to the disagreements between the Martones that OFC contends took place during the training and testing of the equipment.  The relevance to the two color press is evident from the testimony of Ray Seaward and Ben Taylor that the difference is simply that a four color press has two additional towers with the colors.

Page 30, line 1 – line 9 – This question merely addresses Mr. Graham's experience with the DPM and has relevance for that reason.  The fact that he did not have anything to do with the DPM is relevant because Ray Seaward, the trainer on the press, likewise did not have much experience at the time with DPMs.

Page 33, line 6 – Page 34, line 13 – The testimony is offered to confirm that Tad Graham told Ray Seaward he was leaving AT Publishing, but confirming that he was not leaving immediately and could have been trained on the press and ultimately to establish what his current job is, which may or may not play into his credibility.

**Counter Designations for Redirect by AT Publishing**

Page 30, line 19 – Page 31, line 4 – Object to the testimony because it does not establish when Mr. Graham would walk past the press and seeing

waste buildup – whether it was when Ray Seaward was training and/or when someone not trained on the press was trying to operate it and/or whether or not it was before purported acceptance of the lease on March 24, 2003. Without this appropriate foundation, there is no relevance to Mr. Graham's observations which could have been months after the litigation began. This is the very type of testimony on the "performance" of the press which is not relevant and is indeed irreparably harmful to OFC, which had nothing to do with the operation of the press, when no appropriate foundation as to time and circumstances is provided.

Page 31, line 8 – Page 32, line 2 – The questions and answers in this designation are the same as the above and carry the same objections.

Page 34, line 2 – No objection.

s/ Marion F. Walker
Marion F. Walker
Attorney for Defendant OFC Capital

OF COUNSEL:
FORD & HARRISON LLP

Randall J. Weddle
Alaska Bar No. 7206034
Attorney for OFC Capital

OF COUNSEL:
HOLMES, WEDDLE & BARCOTT, P.C.

**CERTIFICATE OF SERVICE**

    I hereby certify that, on the 16th day of May, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    Michael T. Stehle
    Law Office of Michael Stehle, PC
    737 West 5th Ave., Suite 206
    Anchorage, Alaska 99501

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

    Not Applicable.

                                                s/ Marion F. Walker
                                                    Of Counsel

Birmingham:16434.1