Michael T. Stehle
LAW OFFICE OF MICHAEL STEHLE, P.C.
737 W. Fifth Ave., Suite 206
Anchorage, Alaska 99501
Phone:  (907) 677-7877
Fax:     (907) 677-7894
Attorneys for Plaintiff AT Publishing, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| AT PUBLISHING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| A.B. DICK COMPANY and | ) | |
| OFC CAPITAL, a division of | ) | |
| ALFA FINANCIAL CORPORATION, | ) | |
| | ) | Case No. A04-0011 CV (JWS) |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S RESPONSE TO OFC'S MOTION TO RECONSIDER RULINGS ON EXHIBITS

Plaintiff files this response to OFC's motion for reconsideration pursuant to the

Court's order at docket 146.  Plaintiff does not believe the motion has any merit.

However, in further preparing for trial and attempting to keep the trial focused and

efficient, plaintiff agrees to withdraw exhibits 3, 9, 10, 14, 16-23, 25, 36-39, 41, 47-49, 51,

52, 56, 74, 79, and 80.  Plaintiff responds to the motion as it pertains to the other

referenced exhibits as follows.

Because OFC reiterates many of the same objections it made prior to the Court's

ruling on exhibits, and those objections were premised upon its unilateral view of the

issues in dispute on its counterclaim, to which AT Publishing disagrees, plaintiff sets forth

the following brief summary of the issues in dispute.

In its counterclaim, OFC sues for breach of the lease agreement arguing that under

the UCC's hell or high water provision, AT Publishing's payment obligations became

irrevocable once AT Publishing "accepted" the equipment.  Thus a basic dispute is whether

AT Publishing accepted the equipment.  Acceptance can be express or implied, and both

are in dispute.  Despite OFC's self-serving arguments to the contrary, AT Publishing has

never admitted to accepting the press and this Court has expressly stated "that genuine

issues of material fact are present regarding whether AT Publishing accepted or rejected

the subject equipment."  Order from Chambers at pages 16-17.  The legal framework for

this issue is as follows:

> "Acceptance of goods occurs after the lessee has had a reasonable
> opportunity to inspect the goods and
>> (1)      the lessee signifies or acts with respect to the goods in a
>> manner that signifies to the lessor or the supplier that the goods are
>> conforming or that the lessee will take or retain them in spite of their
>> nonconformity; or
>> (2)      the lessee fails to make an effective rejection of the goods
>> under § 2A-509."

U.C.C. § 2A-515, O.C.G. § 11-2A-515, AS 45.12.515.  A lessee may reject goods *if they*

*"fail in any respect to conform* to the lease contract."  U.C.C. § 2A-509, O.C.G. § 11-2A-

509, AS 45.12.509.

What is a reasonable time to inspect, and whether conduct has amounted to

acceptance or rejection are questions of fact "to be determined within the framework of

each particular case." *Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.* 977 P.2d 541, 544-

45 (Utah App. 1999).

> Taking possession of the goods is not determinative of acceptance, nor is the signing of a form acceptance before receipt of the goods, nor the making of a lease payment. "A 'reasonable time to inspect' under the UCC must allow an opportunity to put the product to its intended use, or for testing to verify its capability to perform *as intended*.

*Colonial Pac. Leasing Corp.,* 977 P.2d at 545 (Utah App. 1999).

If "a lessee rightfully rejects the goods or justifiably revokes acceptance of the

goods, then with respect to the goods involved . . . *the lessor is in default under the lease*

*contract . . . ."* U.C.C. § 2A-508, O.C.G. § 11-2A-508, AS 45.12.508.[1]

Finally, if a lessee rightfully rejects nonconforming goods, the lessor or vendor

may attempt to cure. U.C.C. § 2A-513, O.C.G. § 11-2A-513, AS 45.12.513. It is

axiomatic that if the lessor or vendor rightfully cures, then the lessee may not reject the

goods, because they are conforming, and, therefore, it is deemed to have accepted them.

*Id.*; U.C.C. § 2A-515, O.C.G. § 11-2A-515, AS 45.12.515. Thus, A.B. Dick's attempt to

---

[1]    OFC's repeated protestation that it had no duty to deliver conforming goods is specious. The legal framework set out above clearly requires it to deliver conforming goods. Indeed, it states that OFC is in default of the lease contract if it does not deliver conforming goods and AT Publishing rejects those nonconforming goods. And Georgia law does not allow OFC to negate that obligation (A lease contract is effective and enforceable according to its terms between the parties except "where there is a specific rule to the contrary in this Article." Ga. Code § 11-2A-301, cmt.1). Moreover, the lease documents themselves create such a duty. The master lease itself refers to no particular goods to be leased under the contract but, rather, incorporates two lease schedules that identify the goods to be leased ("Lessor hereby leases to lessee . . . the personal property described in each such schedule, together with all replacement parts, repairs, additions, accessories and systems incorporated therein or affixed thereto (as described in each schedule, hereinafter collected[sic] referred to as the 'Equipment'")). . See plaintiff's exhibit 28. The schedules, in turn, reference, attach and incorporate the A.B. Dick sales order ("EQUIPMENT DESCRIPTION: SEE SUPPLIER'S INVOICE(S) ATTACHED AS EXHIBIT 'A' HERETO AND INCORPORATED HEREIN BY REFERENCE FOR DESCRIPTION OF THE EQUIPMENT."). *Id.* Thus, the master lease states that lessor has an obligation to lease the equipment identified in the A.B. Dick sales order. OFC was obviously not free to deliver nothing, nor to deliver something other than what was represented by A.B. Dick sales order.

cure had real consequences vis-à-vis the rights and liabilities flowing between AT

Publishing and OFC.  If the cure was successful, AT Publishing had no right to reject and

it would be bound to the lease.  On the other hand, if the cure was unsuccessful, it supports

the fact that the goods were not conforming giving AT Publishing the right to reject.  If

that rejection was rightful (i.e., the goods were not conforming and the rejection was

seasonable) then OFC is in breach of the lease contract and AT Publishing may cancel the

same.  U.C.C. § 2A-508, O.C.G. § 11-2A-508, AS 45.12.508  (If "a lessee rightfully

rejects the goods or justifiably revokes acceptance of the goods, then with respect to the

goods involved . . . *the lessor is in default under the lease contract* and the lessee may

cancel the lease contract").  Thus, the cure attempt dictated whether AT Publishing could

cancel its contract with OFC.

A brief outline of the facts to be presented by AT Publishing follows.  The exhibits

which are the subject of OFC's motion are referenced where appropriate.

The equipment was installed during the first week of March 2003.  The installers

were not operators, however, so other than connecting the various pieces of equipment and

plugging them in, they could not demonstrate the performance of the equipment.  Their

attempt to tune or register the press was unsuccessful.  Exh. 4.

Trainers were sent in mid-March for what was supposed to be one week of training

but turned out to be a one-week service call.  Most of the week was spent attempting to

tune, register or repair the press.  Exh. 4.

Following that week of training/service, AT Publishing was unable to get the

equipment to operate.  Plaintiff believes that the evidence will show that both A.B. Dick

and OFC were aware of that fact.  Accordingly, trainers/technicians were again sent in early to mid April.  Almost that entire second week was again spent with the A.B. Dick representative attempting to adjust/fix the equipment.  He was continually making adjustments using small allen wrenches.  He did not leave until early Sunday morning.  On Monday, AT Publishing discovered that the press had been damaged because an allen wrench had been left inside the press.  AT Publishing had not had the covers off the press that day and had not used any allen wrenches on the press that day.  AT Publishing contacted A.B. Dick and arrangements were made to repair the damage.  By this time AT Publishing had seen enough and it rejected the press.  It requested A.B. Dick to remove the press.  A.B. Dick requested permission to repair the press (see exhs. 57 & 58), and also to demonstrate that the press could perform as intended/represented.  Exh. 55 & 75 (the identical letter produced from OFC's files).  Arguably, it had a right to do so.  U.C.C. § 2A-513, O.C.G. § 11-2A-513, AS 45.12.513.  While AT Publishing initially took the position that the time to cure or demonstrate the performance of the equipment had passed, it quickly acquiesced in the request to attempt to demonstrate or cure the equipment, (see exh. 54 from ATP's files and exh. 76, the identical letter from OFC's files).  Significant time passed as the parties discussed performance criteria, exhs. 53, 77-78, but they ultimately reached an agreement on what the press should be capable of doing to be considered conforming.  Exh. 50.  Throughout this time the press went completely unused.

The test/cure occurred in late April and early May 2004.  To remove the excuse that the problems originated with AT Publishing's operators and not the equipment, all preparation work and all operations were performed by A.B. Dick specialists.  The

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 5 of 14

agreement called for 5 days of preparation to be followed by 5 days of operation.  In fact,

however, A.B. Dick could not get the press to operate properly and, instead of

demonstrating the press for five days, it only operated on the last day, May 7, 2004.

During this time AT Publishing discovered that the A.B. Dick representatives had thrown

away a damaged blanket, exhs. 1 & 2, which demonstrated that a bolt or some other

foreign object had come loose and was run through the press during their operation of the

press, tearing the blanket and damaging the press.  Exhibit 6 is a copy of the job being run

at the time which demonstrates that what appears to be a bolt was run through the press by

the A.B. Dick technicians.  Again, this demonstrates the unreliability/nonconformity of the

press without regard to the operator.  It is also relevant insofar as the press incurred

significant damage making it worth less money as a used press, if not repaired, and it

effects the damage claims in this lawsuit.  In or around June 2004, A.B. Dick repossessed

the press.  And again, all of these facts were disclosed to OFC during discovery.

**Plaintiff's Exhibits 1-2, 4-8, 50, 53, 54, 55, 57, 58, 75-78**:  While Plaintiff's

exhibits 1-2 do not photocopy, they are clearly identified on their back sides as "offset

blankets."  They are from the press at issue, an offset press.  The image is transferred from

the offset blanket to the paper stock being printed.  They demonstrate the damage to the

press caused by A.B. Dick during the attempted cure.

Exhibit 4 is a box of printed paper kept by AT Publishing from the operation of the

equipment.[2]  It is divided into three categories of documents.[3]  The first stack is a series of

---

[2]    Undersigned counsel recently learned that this box is just a small sample of the waste produced by
the press.  There are stacks of waste from the press that would equal 24 to 30 boxes of waste.  The amount of
waste produced by the press in order to produce a marketable product has been an issue since the beginning

printed test patterns; small colored squares.  These were printed during the initial

installation and initial "training" in an attempt to get the press "tuned."  They are relevant

to demonstrate the problems with the press, i.e., scumming, washing out etc.  The second

stack represents an attempt to get a printed product by A.B. Dick's representatives in April

2004 during the attempted cure.  It is printed from a plate supplied by A.B. Dick in an

attempt to eliminate any issue with the platemaker installed at AT Publishing.  The product

has a date of April 30, 2004 and it is for a Nebraska client, i.e., it is not one of AT

Publishing's client's and AT publishing did not supply the plate.  Again, they demonstrate

the problems with the press as far as scumming, washing out, registration etc., and they

demonstrate that the cure was not successful.  And, they eliminate the platemaker or

operator thereof as the source of the problem.  The third stack is test patterns from the

April 2004 cure attempt.  Again, they are clearly date stamped.  They are relevant to show

the continuing and difficult registration problem with the press and tend to demonstrate

that the cure was not successful.

Exhibit 5 is a test pattern from a properly operating press to demonstrate the

differences.  In other words, without a proper test pattern the problems in the subject test

pattern are not obvious to non-printers.

Exhibit 6 is a copy of the job being run when A.B. Dick ran a bolt through the press

damaging it.  It shows the image of the bolt.

of this litigation.  The product was marketed as producing a marketable product with little waste.  See exhibit 27.  The witnesses designated by OFC have testified about this waste and seeing the piles of waste.  The pile is available for inspection if defendant desires.  While it is impractical to produce this volume of material in court, plaintiff is taking a picture of the pile that will be produced to defendant tomorrow.  It is plaintiff's intention to mark the picture as an additional exhibit.

[3]     If it is helpful, plaintiff can individually mark these three stacks of paper.

Exhibit 7 is a copy of the job that was being run by A.B. Dick during the attempted cure before the bolt was run through the press. It demonstrates the problems with the press as far as registration, scumming etc.

Exhibit 8 is the same printing job as exhibit 7 performed on a different press to demonstrate the problems with the quality of the press at issue, i.e. to highlight the differences.

The relevance of exhibits 50, 53, 54, 55, 57, 58, 75-78 should be apparent in the above discussion.

This is not, as OFC suggests, an attempt to assert a warranty claim. But the performance of the press is clearly at issue. Indeed, as noted many times before, the vast majority of the testimony and evidence proffered by OFC is an attempt to show that there was nothing wrong with the press, and that the entire fault lies with AT Publishing's operators. AT Publishing is clearly within its rights to submit evidence to prove its right to reject the equipment; i.e. to show that the equipment was nonconforming and that the attempt at cure failed. Moreover, it would be severely prejudicial to AT Publishing if it could not rebut the evidence proffered by OFC.

**Exhibits 11-13, 15, 24, 40:** OFC continually wants to offer only one side of the picture. It continually wants to offer testimony and exhibits about a particular subject or event that supports its theories and deny AT Publishing the opportunity to offer evidence about that same subject or event that favors AT Publishing. Defendant's exhibits BB, RRR, and SSS all concern the Indigo press. And, it has offered deposition testimony concerning those exhibits; i.e. concerning the Indigo press. It is not doing so, as it slyly

claims, because it agrees with AT Publishing that those documents concerning the Indigo

press are relevant.  It is doing so because those documents and the accompanying

testimony concerning them advance their arguments.  Indeed,  AT Publishing has no

interest in Exhibits RRR and SSS being admitted.  They are prejudicial to AT Publishing.

If, by prejudicial, we mean that they only advance OFC's arguments.  Of course that is not

the meaning of prejudicial in the rules of evidence but it is precisely how OFC loosly uses

that term.

Acceptance cannot occur until after the lessee has had a reasonable opportunity to

inspect the equipment.  U.C.C. § 2A-515, O.C.G. § 11-2A-515, AS 45.12.515.  What is or

is not a reasonable time is a fact question "to be determined within the framework of each

particular case."  *Colonial Pac. Leasing Corp.,* 977 P.2d at 544-45.  At a minimum, "a

'reasonable time to inspect' under the UCC must allow an opportunity to put the product to

its intended use, or for testing to verify its capability to perform *as intended*."  *Colonial*

*Pac. Leasing Corp.,* 977 P.2d at 545.  What was intended is again a question of fact "to be

determined within the framework of each particular case."  *Colonial Pac. Leasing Corp.,*

977 P.2d at 544-45.  Throughout this "reasonable time," the conduct of the lessee must be

scrutinized to see if that conduct *implies* acceptance or rejection.  U.C.C. § 2A-515, O.C.G.

§ 11-2A-515, AS 45.12.515.  Again, whether the conduct implies acceptance or rejection is

a question of fact "to be determined within the framework of each particular case."

*Colonial Pac. Leasing Corp.,* 977 P.2d at 544-45.

So did the equipment perform *as intended*?  What are the facts to show what was

intended?  What was intended is inherently bound to the experience with the Indigo press.

AT Publishing wanted a process color press that was more economical to run than the Indigo press and was more reliable than the Indigo press.

Was AT Publishing's conduct vis-à-vis the 4995 press reasonable?  Well you cannot view that conduct divorced from the experience with the Indigo press.  Just as OFC wants to argue that AT Publishing's experiences with the lease and the training on the Indigo press are relevant to show their experience with finance leases and training (see OFC's brief on reconsideration at page 5), so too their experience with the cost and unreliability of the Indigo press are relevant to show what they expected in the replacement press.

Moreover, as previously stated in prior filings, OFC's claim for damage is inherently linked to the Indigo press.

OFC will not be prejudiced by evidence concerning the Indigo press.  Plaintiff has no intention of linking OFC to that press other than as is necessary for purposes of explaining the rollover financing.  AT Publishing will be prejudiced, however, if only OFC is allowed to offer its evidence concerning the Indigo press.  And AT Publishing will be prejudiced if it cannot offer evidence of the factual circumstances leading up to its agreement to acquire the 4995 so that the jury can consider what the parites intended and judge their conduct "within the framework of [this] particular case." *Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.* 977 P.2d 541, 544-45 (Utah App. 1999).

**Exhibit 81:**  OFC continually misrepresents the date of these documents.  The cover letter clearly states that they were sent to OFC in July 2002, not 2003.  They are business records produced from OFC's files pursuant to this Court's order granting

plaintiff's motion to compel.  They were sent to OFC so that OFC could decide if it wanted

to continue to assume the risks of the pre-funding agreement it entered into with A.B.

Dick.

It is plaintiff's contention that OFC prematurely released the funds to A.B. Dick.

Under its prefunding agreement it released 75% of the $375,000 purchase price

approximately 4 months before the equipment was even delivered.  Every day that passed

was eroding the interest rate or profit margin calculated into its lease with AT Publishing,

causing it to become anxious as evidenced by the weekly calls to AT Publishing inquiring

whether the equipment had been delivered yet.  Once the equipment was delivered it was

not interested in making sure that AT Publishing was satisfied with the equipment, it was

only interested in closing the transaction.  Which it did, prematurely.  And it took this risk

knowingly, as evidenced by its requested receipt of the financial information represented

by Exh. 81.

**Exhibits RR, SS, VV & YY:**  Exhibit RR is hearsay and any probative value is

outweighed by unfair prejudice.  Greg Martone is not a party to this action and he is

neither an officer nor manager at AT Publishing.  He is merely an employee who happens

to be the youngest son of Frank Martone.  It was not within the scope of Greg's

employment to lease or not lease the press at issue, or, frankly to take any other action with

regard to the press.  Indeed, his only involvement with the press was to be available to train

on the press during the first training session in March.  Because the press was not

operational he received no training as testified to by Ray Seaward in the deposition

testimony designated by OFC.  Thereafter, he was not even scheduled to be trained on the

press and he received no training.  He was not authorized to speak on behalf of AT

Publishing with regard to the press.  Indeed, AT Publishing was not even initially aware of

the email sent by him from A.B. Dick's website.[4]

OFC states that it wants to admit this document to show that AT Publishing

acknowledged that a lease was in place.  Clearly Frank Martone's youngest son, who had

no involvement with the decision to lease or not lease the press, had no foundation to even

know if a lease was in existence.  The existence of the lease is a legal question.  And any

probative value of a young man's unauthorized, out-of-court rant is outweighed by its

prejudicial effect.  This is not an admission of a *party* opponent; it is the unauthorized

ranting of a young man.  It is properly excluded.

Exhibit SS is a memo written by a witness to the lawyers for defendants during the

course of this litigation.  It is no different than if I went to all of AT Publishing's witnesses

and had them write self-serving statements of "what happened."  If the Court has read the

deposition designations for this witness than it knows that the witness had no trouble

recollecting or testifying.  Moreover, a recorded recollection under 803(5) does not itself

come into evidence.  It is properly excluded.

Exhibit VV is simply a duplicate of RR and is properly excluded for all of the same

reasons.

Exhibit YY contains double and triple hearsay.  It is not even clear where all of the

supposed information comes from and it has little to no probative value.  OFC's plaintiff

---

[4]    AT Publishing could not produce the email because it did not have a copy of it.  It was sent from the
website which does not download a copy to the computer from which it was sent.  However, contrary to
OFC's implication that AT Publishing was hiding something, it was AT Publishing that informed the parties

cry that it is the only evidence it has, rings hollow; the Court need only review its

deposition designations and the mountain of other exhibits, most of which plaintiff willing

accepted into evidence.

Finally, to the extent that OFC intends to make good on its threat to designate

additional deposition testimony plaintiff requests that it be required to designate by line

and page any additions so that plaintiff can efficiently identify the additions for purposes

of stating objections.  We are now one week from trial and plaintiff is represented by a solo

practitioner with no secretary and only a contract paralegal.  OFC's conduct of late,

requesting reconsideration of every ruling, makes plaintiff believe that they are

deliberating attempting to keep its counsel from preparing for trial.

DATED this 7th day of June, 2007, at Anchorage, Alaska.

s/ Michael T. Stehle
Michael T. Stehle, ABA No. 9106054

**Certificate of Service**

I hereby certify that on June 7, 2007
a true and correct copy of the foregoing was
electronically mailed to the following:

that Greg had taken this unauthorized action.
PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 13 of 14

Patrick Gilmore
acgef@acglaw.com, pbg@acglaw.com, dap@acglaw.com.

Marion Walker
mfwalker@fordharrison.com, mwilkens@fordharrison.com, dbivins@fordharrison.com.

Randy Weddle
rweddle@hwb-law.com,          bfontaine@hwb-law.com,          jekstrand@hwb-law.com,
kwarne@hwb-law.com.


s/ Michael T. Stehle
Michael T. Stehle