Michael T. Stehle
LAW OFFICE OF MICHAEL STEHLE, P.C.
737 W. Fifth Ave., Suite 206
Anchorage, Alaska 99501
Phone:  (907) 677-7877
Fax:     (907) 677-7894
Attorneys for Plaintiff AT Publishing, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| AT PUBLISHING, INC., ) | |
| ) | |
|   Plaintiff, ) | |
| ) | |
|   vs. ) | |
| ) | |
| A.B. DICK COMPANY and ) | |
| OFC CAPITAL, a division of ) | |
| ALFA FINANCIAL CORPORATION, ) | |
| ) | Case No. A04-0011 CV (JWS) |
|   Defendants. ) | |
| _____ ) | |

### PLAINTIFF'S RESPONSE TO OFC'S MOTION TO RECONSIDER RULING ON ISSUES

**I.    Introduction**

Plaintiff files this response to OFC's motion for reconsideration pursuant to the

Court's order at docket 160.  Plaintiff objects to OFC's attempt to have a dispositive

motion heard well more than a year after the deadline for filing such motions under the

pre-trial order.  Plaintiff also takes issue with OFC's attempt to prejudice the Court against

AT Publishing by making inaccurate representations regarding the conduct of the parties

during this lawsuit.

When the time to meet and mark exhibits approached, OFC's counsel informed AT

Publishing's counsel that its exhibits were still out of state and suggested continuing the meeting for one week. AT Publishing agreed, noting that it too could use more time to prepare exhibits. But none of that is relevant to the actual issues presented by OFC's motion.

OFC also falsely accuses plaintiff of not supporting its claims by reference to the appropriate statutory citations. For instance, on the bottom of page three of its motion, OFC erroneously states: "AT Publishing was not able to identify any statutory authority for imposing *a right* or liability on a finance lessor to cure." This is false. AT Publishing has cited to Section 2A-513 in the joint statement of issues, in its proposed jury instructions, in its trial brief, and in responses to OFC's various motions. Section 513 provides that if a lessee rightfully rejects nonconforming goods, the lessor may attempt to cure. U.C.C. § 2A-513, O.C.G. § 11-2A-513, AS 45.12.513. This statutory authority clearly and certainly grants a right to cure on a finance lessor.

Similarly, OFC continuously and erroneously asserts that there is no authority for the claim that OFC breached the lease by failing to deliver or tender conforming goods. Again, this is simply false. Section 2A-509 states that if the goods delivered under the lease are not conforming in any respect, that AT Publishing, the lessee, may reject them.[1] U.C.C. § 2A-509, O.C.G. § 11-2A-509, AS 45.12.509 ("if the goods or the tender or delivery fail in any respect to conform to the lease contract, the lessee may reject" them). Similarly, Section 2A-517 regarding revocation provides that even if the goods are

---

[1] The concept of delivering conforming goods under the statute refers to delivery in the legal sense, i.e., to lease or tender conforming goods, not in the transportation sense of who actually shipped the goods.

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 2 of 17

accepted, a "lessee may revoke acceptance of a lot or commercial unit whose

*nonconformity* substantially impairs its value to the lessee if the lessee has accepted it . . .

(2) without discovery of the nonconformity [and] the lessee's acceptance was reasonably

induced [] by the lessor's assurances . . . ."  U.C.C. § 2A-517, O.C.G. § 11-2A-517.

Finally, section 508 provides that if "a lessee rightfully rejects the goods or justifiably

revokes acceptance of the goods, then with respect to the goods involved . . . *the lessor is*

*in default under the lease contract* . . . ."  U.C.C. § 2A-508, O.C.G. § 11-2A-508, AS

45.12.508.  Thus, failure to tender conforming goods makes them subject to rejection or

revocation, and it is a default by the lessor under the lease contract.  *Id.*

## II.    Legal and Factual Background

In this case AT Publishing is suing OFC under UCC § 2A 508 for breach of the

lease contract.  Section 508 provides:

> **Lessee's remedies:**  (a)  If a lessor fails to deliver the goods in conformity with the
> lease contract (§ 509) or repudiates the lease contract (§ 402), or a lessee rightfully
> rejects the goods (§ 509) or justifiably revokes acceptance of the goods under
> section 517, then with respect to the goods involved, and with respect to all of the
> goods if under an installment lease contract, the value of the whole lease contract is
> substantially impaired (§ 510), the lessor is in default under the lease contract and
> the lessee may
>> (1)    cancel the lease contract under section 505(a);
>> (2)    recover as much of the rent and security as has been paid and as is
>>        just under the circumstances;
>> (3)    cover and recover damages under sections 518 and 520 as to all
>>        goods affected whether or not they have been identified to the lease
>>        contract, or recover damages for nondelivery under sections 519 and
>>        520;
>> (4)    exercise other rights or pursue other remedies provided in the lease
>>        contract.

U.C.C. § 2A-508, O.C.G. § 11-2A-508, AS 45.12.508.[2]  To prevail on this claim AT

Publishing may prove rightful rejection *or* justifiable revocation.  These claims are alleged

in the alternative.

A rejection is rightful if (1) the goods are nonconforming and (2) the rejection is

within a reasonable time after tender or delivery.  U.C.C. § 2A-509, O.C.G. § 11-2A-509,

AS 45.12.509.  Goods are nonconforming if they do not perform *as intended*.  And the

time for rejection does not begin to run until the time given to the lessee to inspect or test

the equipment to verify its capability to perform *as intended*, has ended.  *Colonial Pac.*

*Leasing Corp. v. J.W.C.J.R. Corp.* 977 P.2d 541, 544-47 (Utah App. 1999).  As stated by

the court in *Colonial Pacific Leasing*:

> Taking possession of the goods is not determinative of acceptance, nor is the
> signing of a form acceptance before receipt of the goods, nor the making of a lease
> payment.  "A 'reasonable time to inspect' under the UCC must allow an
> opportunity to put the product to its intended use, or for testing to verify its
> capability to perform as intended.
> . . .
> Assuming the goods do not conform to the lease contract, section 2A-509(2) places
> the lessee under an affirmative duty to reject them on pain of being deemed to have
> accepted them . . . .   Because failure to make a proper rejection amounts to an
> acceptance, section 2A-509(2) is closely related to section 2A-515(1)(b), which
> deals with acceptance and cross-references section 2A-509(2).
> To make an effective rejection, the rejection must occur within a reasonable time
> after the tender or delivery of the goods.  The duration of the reasonable time in
> which the lessee has the right to reject will vary with the circumstances. . . .   It
> should be remembered that the lessee has a reasonable opportunity to inspect the
> goods before the lessee is deemed to have accepted them under section 2A-515(1).
> *The affirmative duty to reject on pain of being deemed to have accepted does not*
> *arise until the time given the lessee to inspect has ended.*

---

[2] Georgia law does not allow OFC to negate the protections afforded by section 2A of the UCC.  (A lease
contract is effective and enforceable according to its terms between the parties except "where there is a
specific rule to the contrary in this Article."  Ga. Code § 11-2A-301, cmt.1).

*Colonial Pac. Leasing Corp.,* 977 P.2d at 545, 547 (Utah App. 1999) (citing 2A Hawkland and Miller § 2A-509:08, at 780-81) (emphasis in original).

To prove its claim that its rejection of the equipment was rightful, AT Publishing is entitled to present evidence that (1) the equipment did not perform as intended (which of course requires that AT Publishing be allowed to introduce evidence of what was intended), and (2) that its testing and ultimate rejection of the equipment was reasonable under the circumstances.

What was intended is directly related to the experience with the Indigo press. The Indigo press was unreliable and too expensive to operate. AT Publishing met with A.B. Dick in Anchorage to discuss these problems with the Indigo press, to review the other presses in AT Publishing's possession, to go over the market that AT Publishing was attempting to capture, and to discuss the performance needs of the sought after equipment to capture that market. During the course of this meeting, which took place over the course of two days, representations were made regarding the performance of the 4995 press. The above evidence defines how the equipment was intended to perform.[3]  Before AT Publishing was required to reject the equipment on pain of being deemed to have accepted it, AT Publishing was entitled "to put the product to its intended use, or for testing to verify its capability to perform as intended." *Colonial Pac. Leasing Corp.,* 977 P.2d at 545.

Inspection or testing of the equipment was delayed because A.B. Dick did not have local technicians with experience in this particular equipment. The press, while carrying

---

[3] Regrdless of whether these representations would give rise to a warranty claim against A.B. Dick and/or OFC, the evidence of what was discussed is relevant on the issue of how the equipment was intended to perform.

the A.B. Dick name, was manufactured in Japan by Ryobi. Ryobi licensed A.B. Dick to purchase, modify and sell its entry level four color process press under the A.B. Dick name. A.B. Dick had modified and installed fewer than a dozen of these presses worldwide at the time it marketed this press to AT Publishing. The installers had little to no experience with installing this equipment. And they professed to not know how to operate it. Thus, AT Publishing could not verify the equipment's ability to perform as intended when it was installed, because A.B. Dick had not sent anyone who knew how to operate the equipment.[4] Following installation, when A.B. Dick asked AT Publishing to sign its delivery and installation receipt, Exh. M, AT Publishing initially refused stating that it had not yet seen the equipment operate. A.B. Dick assured AT Publishing that the receipt was merely an acknowledgment that the equipment had been delivered and did not mean that it had been accepted. Doc. 24, Aff. of A. Martone, ¶ 4.

The A.B. Dick trainers similarly had little or no experience with this equipment. Burt Green, who was sent to train on the platemaker, confesses to his superiors that he had never before seen the software that controlled the ink volume setter on the equipment and that he trained "as best he could." Exh DD. Ray Seaward, sent to train on the 4995 press, had *never* before trained on that press. Exh. 88, Depo. of R. Seaward, at p. 139. He spent the entire week he was scheduled to be in Anchorage complaining that the press had not been properly installed by the installers, and attempting to adjust the press. The first attempt at training ended with A.B. Dick acknowledging that the installation process was

---

[4] The equipment consisted in a 4995 press and attachments and 2340 digital platemaker and attachments. They were sold to work together.

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 6 of 17

still "continuing" and promising to provide certain additional equipment and further training or installation. Exh. MMM.

Throughout this time Frank Martone spoke with OFC representatives weekly informing them initially that the equipment had not yet arrived and, eventually, that while the equipment had been installed, it was not yet operational. Doc. 24, Aff. of F. Martone.

A.B. Dick sent operators/trainers again in mid April. Again, the evidence will show that almost the entire week was spent trying to adjust the equipment as opposed to demonstrating its capability. Seaward continually adjusted the press throughout the week using small allen wrenches. Seaward left Anchorage early Sunday morning April 20, 2003. The following Monday he admitted that "[t]here are still problems with the press or the plates. I am not sure which." Exhibit XX. Later that same Monday, AT Publishing discovered that a small allen wrench that had been left in the press, had run through the press damaging one of its drums. Arrangements were made for A.B. Dick to repair the press and, again, OFC was kept in the loop by Frank Martone. When OFC later attempted to assert that the lease had commenced, AT Publishing hired Mike Mills who wrote informing OFC that AT Publishing was rejecting the press. Exh AAA. The above evidence defines AT Publishing's attempt to verify that the equipment would perform as intended leading to its formal rejection. AT Publishing believes the jury will find this to be reasonable under the circumstances.

In its counterclaim, OFC alleges that the rejection was not rightful. It argues both that the equipment was conforming and, therefore, that AT Publishing had no right to

---

reject the press, and also that the rejection was not timely. It relies in part on a delivery and acceptance receipt that it had AT Publishing sign in November 2002, long before the equipment was even delivered. It also relies on the A.B. Dick installation and activation receipt that A.B. Dick had assured AT Publishing did not signify acceptance. In the litigation, both A.B. Dick representatives as well as OFC representatives now take the position that the A.B. Dick installation and activation certificates *do* signify acceptance and that both A.B. Dick and OFC were aware of that practice at the time it was misrepresented to AT Publishing. B. Green Depo., Exh WWW at p. 58. OFC claims that it relies on A.B. Dick to get the client to sign the installation and activation receipts so that it may enforce its lease against the lessee, and A.B. Dick claims that it is aware that it is doing so to benefit OFC. B. Taylor Depo., Exh. XXX at p. 43-44.

OFC seeks damages in the form of accelerated lease payments. Pursuant to the terms of the lease that state that either OFC *or its agent* may repossess the press, A.B. Dick, not OFC, took the press back and sold it. OFC representatives could not provide any information regarding the repossession or subsequent sale stating that they were relying on A.B. Dick. R. Leas Depo., Exh 90 at pp. 28-29. OFC's damage analysis purports to give a $151,000 credit for the sale of this brand new $375,000 press.

It is against this background that the issues of cure and agency must be analyzed.

## III.    Cure

At a minimum, cure is relevant on at least two separate issues. Cure is relevant on the issue of AT Publishing's right to reject the press, and it is relevant on AT Publishing's claim that OFC failed to properly mitigate its claimed damages.

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 8 of 17

If a lessee rightfully rejects nonconforming goods, the lessor or vendor may attempt to cure.  U.C.C. § 2A-513, O.C.G. § 11-2A-513, AS 45.12.513.  It is axiomatic that if the lessor or vendor rightfully cures, then the lessee may *not* reject the goods, because they are proven to be conforming, and, therefore, the lessee is deemed to have accepted them.  *Id.*; U.C.C. § 2A-515, O.C.G. § 11-2A-515, AS 45.12.515.  Thus, an attempt to cure by either the vendor or the lessor has real consequences vis-à-vis the rights and liabilities flowing between the lessee and lessor.  If the cure is successful, the lessee has no right to reject and it would be bound to the lease come hell or high water.  On the other hand, if the cure is not successful, it supports the fact that the goods were not conforming giving the lessee the right to reject.  If that rejection is rightful, i.e., the goods are not conforming and the rejection was seasonable, then the lessor is in default of the lease contract and the lessee may cancel the same and seek appropriate damages.  U.C.C. § 2A-508, O.C.G. § 11-2A-508, AS 45.12.508   (If "a lessee rightfully rejects the goods or justifiably revokes acceptance of the goods, then with respect to the goods involved . . . *the lessor is in default under the lease contract* and the lessee may cancel the lease contract").  Thus, the cure attempt in the case at bar dictated whether AT Publishing could cancel its contract with OFC.

Following AT Publishing's rejection of the press, A.B. Dick requested permission to repair the press (see exhs. 57 & 58), and also to cure or demonstrate that the press could perform as intended/represented.  Exh. 55 & 75 (the identical letter produced from OFC's files).  Arguably, it had a right to do so.  U.C.C. § 2A-513, O.C.G. § 11-2A-513, AS 45.12.513.  The right to do so was arguable, because a request to cure must be timely.

While AT Publishing initially took the position that the time to cure or demonstrate the performance of the equipment had passed, it quickly acquiesced in the request to attempt to demonstrate or cure the equipment. (See exh. 54 from ATP's files and exh. 76, the identical letter from OFC's files)

Plaintiff understands that in the litigation, OFC now takes the position that only A.B. Dick attempted to cure, not OFC. First, even if that were true, the attempt to cure is still relevant because its outcome affected the legal relationship and the rights and liabilities of OFC and AT Publishing. As shown above, if the cure had been successful, AT Publishing would have been bound to the lease come hell or high water. The fact that the cure was not successful supports AT Publishing's right to reject leaving only the question of whether that rejection was timely under the circumstances.

Moreover, either A.B. Dick had explicit or implicit authority to cure not only on its own behalf, but also as the agent of OFC (which will be discussed in greater detail in the agency section that follows), or, at a minimum, OFC consented to and/or ratified that course of conduct. *Hendrix v. First Bank of Savannah*, 195 Ga.App. 510, 394 S.E.2d 134, 135 (Ga.Ct.App. 1990) (If the principal, with knowledge of the material facts, accepts and retains the benefits of that act either explicitly or implicitly through silence, he thereby ratifies the act).

OFC claims that in June 2003 it was the owner of the equipment. That is, it claims that it had released all of the purchase money to A.B. Dick and that A.B. Dick was supposedly refusing to return those funds. (See OFC's motion at paragraph 8) If this is true, then it was up to OFC to decide what should be done with *its* press. AT Publishing

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 10 of 17

had, by this time, unequivocally rejected the press.  Accordingly, OFC could have exercised its rights under the lease to repossess the press, and sue both AT Publishing and A.B. Dick for damages.  It could have enforced its contractual rights against A.B. Dick for a full refund of all money advanced to A.B. Dick.  See Exhs. J & K ("If Lessee does not accept the equipment *for any reason*, we shall have no obligations hereunder, and you shall refund to us all sums (including taxes and other charges) paid for on account of the equipment.").  It did none of that.  Instead, with full knowledge of A.B. Dick's request to cure, see exhs. 75-76, it consented to and ratified that course of conduct, which, if successful, would have inured to its benefit.

Cure is also relevant on AT Publishing's claim that OFC failed to mitigate its damages.  Following A.B. Dick's request to cure, significant time passed as the parties discussed performance criteria.  Exhs. 53, 77-78.  As should be clear from these exhibits, A.B. Dick and or OFC seemed to be dragging their feet with respect to exercising their right to cure.  Ultimately an agreement was reached regarding what the press should be capable of doing to be considered conforming.  Exh. 50.  The press went completely unused throughout this time.

The test/cure occurred in late April and early May 2004.  To remove the excuse that the problems originated with AT Publishing's operators and not the equipment, all preparation work and all operations were performed by A.B. Dick specialists.  AT Publishing did not touch or otherwise operate the press.  The agreement called for 5 days of preparation to be followed by 5 days of operation.  In fact, however, A.B. Dick could not get the press to operate properly and, instead of demonstrating the press for five days,

it only operated on the last day, May 7, 2004.  During this time AT Publishing discovered that the A.B. Dick representatives had thrown away a damaged blanket, exhs. 1 & 2, which demonstrated that a bolt or some other foreign object had come loose and was run through the press during A.B. Dick's operation of the press, tearing the blanket and damaging the press.  The damaged blanket was shown to A.B. Dick's attorney and OFC was expressly informed of the damage caused by A.B. Dick during the cure process. Exhs. 48-49 ("I do not have to remind you that it was A.B. Dick personnel who disposed of the damaged blanket cylinder in the trash without notice to anyone at AT Publishing or to you during the preparations for the test.").[5]

The cure having been unsuccessful, A.B. Dick packed up and removed the press.  OFC claims that A.B. Dick was repossessing the press for OFC.  R. Leas Depo., Exh 90 at pp. 28-29.  OFC's damage analysis has a credit for $151,000 for the repossessed press.  Was the damage fixed before the press was sold?  If not, why not?  The press was still covered by insurance and OFC was a named insured, so did it make an insurance claim?  If not, why not?  Why did it not bring a claim against A. B. Dick for the damage?  And why did OFC wait a year before attempting to cure or repossess?  During this time the market for digital presses was changing dramatically, and time alone devalued the press.  Thus, the cure and the damage that was caused to the press during the cure, are relevant on the issue of mitigation.

## IV.    Agency

---

[5] AT Publishing has preliminarily agreed to withdraw those exhibits.  It reserves the right to use them impeach or refresh the recollection of OFC's witnesses in the event they deny knowledge of this damage.

An agency relationship exists if :

> (1)  authority to do an act is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to so act on the principal's account, or (2)  apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

Restatement (Second) of Agency §§ 26, 27.  It is axiomatic that two parties could have an agency relationship for one purpose but not another.  Indeed, in the lease finance context, a vendor and lessor can have an agency relationship for one or more purposes.  *Siemens Credit Corp. v. Kakos,* 1995 WL 29618, at *5 (N.D. Ill. 1995) ("Agency is a fluid concept. A person may be an agent in some respects but not others, for some purposes but not others.")

It is undisputed that A.B. Dick was OFC's agent in at least certain respects.  The master lease grants OFC, or its agent, the right to repossess.  OFC's agent, A.B. Dick, repossessed the press in this instance.  And OFC expressly acknowledges that A.B. Dick was doing so at OFC's direction.  Exh. 90 at pp. 28-29.  In this respect, at least, OFC admits that A.B. Dick was its agent.  As discussed above, how that repossession and sale took place is relevant on plaintiff's defense that OFC failed to mitigate its claimed damages.

The jury may also find that A.B. Dick acted as OFC's agent with regard to cure.  OFC was the owner of the press.  OFC claims that A.B. Dick was disclaiming the press, and refusing to return OFC's money.  When A.B. Dick thereafter requested an opportunity to cure, OFC either explicitly or implicitly gave it authority to do so.  Authority to act can

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 13 of 17

be implied from conduct.  Restatement (Second) of Agency §§ 26, 27.  OFC's silence in the face of A.B. Dick's express request to cure can reasonably be interpreted as an implicit grant of authority for it to do so.

A.B. Dick also acted as OFC's agent in getting the installation certificates signed. Both OFC and A.B. Dick acknowledge that A.B. Dick had the lessee sign the installation certificates for the benefit of OFC.  Indeed, under the undisclosed pre-funding agreement, A.B. Dick was contractually obligated to get the certificates signed for OFC's benefit. Exh. W ("The remaining 25% balance of the original equipment cost will be paid to A.B. Dick upon final delivery to the Lessee and the Lessee's final verification and acceptance, along with an executed delivery and acceptance document, which per the terms of this agreement will be within 60 days of the actual 75% prefund date.").  Thus, the authority for A.B. Dick to get a certificate signed on OFC's behalf is created in writing in the pre-funding agreement.  This creates an agency relationship and makes OFC liable for its agent's (mis)representation that the certificates were meant only to signify delivery, not acceptance.  *See Potomac Leasing Corp. v. Thrasher,* 354 S.E.2d 210, 211-13 (Ga. App. 1987); *see also Colonial Pac. Leasing Corp. v. McNatt,* 486 S.E.2d 804, 809 (Ga. 1997) (recognizing *Potomac Leasing* is good law).  And it is also relevant evidence on AT Publishing's revocation claim.

A lessee may revoke acceptance of goods whose *nonconformity* substantially impairs its value to the lessee if the lessee has accepted it without discovery of the nonconformity and if the lessee's acceptance was reasonably induced by the lessor's (or its agents) assurances.  U.C.C. § 2A-517, O.C.G. § 11-2A-517.  Since OFC and A.B. Dick

now claim that A.B. Dick was getting the certificates signed to benefit OFC, OFC should be bound by the representation, or misrepresentation, that the certificates did not signify acceptance. *See Potomac Leasing,* supra; *McNatt,* supra. At the time AT Publishing signed the certificates it was unaware of the nonconforming nature of the equipment, because it had not yet had an opportunity to see the equipment operate. That is why it refused to sign. A.B. Dick then talked AT Publishing into signing the certificate, representing that it signified only delivery, not acceptance. To the extent OFC now claims that the certificate signifies acceptance, such acceptance was reasonably induced by OFC's agent's misrepresentation regarding the significance of the receipts, and AT Publishing is entitled to revoke that acceptance. U.C.C. § 2A-517, O.C.G. § 11-2A-517.

In addition to the above, OFC and A.B. Dick had a contractual agency relationship for the procurement of AT Publishing's lease finance business. In exchange for loans or advances of money from OFC to A.B. Dick, A.B. Dick agreed to procure lease finance business for OFC. Exh. W. Under the so-called "pre-funding agreement," A.B. Dick granted to OFC a "right of refusal on all designated business generated by AB Dick's Western Region (excluding 'cost per copy' lease transactions) that is subject to financing." (See Id.) Thus, When A.B. Dick offered financing, it was doing so on behalf of OFC. Indeed, OFC's sales agent, Al Mickley, testified that he essentially works *through* the A.B. Dick sales team. Exh. 84 at pp. 6-7. OFC provides the A.B. Dick sales team with rate charts and information on how to do leasing, and the benefits of leasing, so that A.B. Dick can sell the product for OFC. *Id.* In fact, with regard to the case at hand, Mickley, the supposed OFC sales person assigned to AT Publishing's account, testified that the A.B.

Dick people stated that they did not need his help in selling the financing arrangements to AT Publishing and that he, Mickley, explained pricing and how to put the deal together to the A.B. Dick sales team who then presented it to AT Publishing.  *Id.* at pp. 5, 10-11. Mickley, the supposed sales person on AT Publishing's account, never even spoke with a single person at AT Publishing.  *Id.* at p.11.  Under circumstances such as these, where the arm's length nature of the three-party lease finance transaction has been corrupted and the vendor acts as an agent for the lessor in the procurement of lease finance business, Georgia courts have held that the lessor can be liable for the misrepresentations of the vendor. *Potomac Leasing,* supra; *McNatt,* supra (recognizing *Potomac Leasing* is good law). Georgia courts further hold that the lessor's and vendor's denials of such an agency relationship in their testimony and in lease documents "are not necessarily conclusive as to the non-existence of such a relationship."  *Potomac Leasing,* 354 S.E.2d at 212; *McNatt,* 486 S.E.2d at 808.  Thus, there is ample evidence from which the jury could conclude that A.B. Dick was OFC's agent in this case.

**V.    Conclusion**

The issues of cure and agency are clearly appropriate issues for trial in this case. AT Publishing respectfully requests that OFC's Motion for Reconsideration be denied for the foregoing reasons.

DATED this 11th day of June, 2007, at Anchorage, Alaska.

s/ Michael T. Stehle
Michael T. Stehle, ABA No. 9106054

**Certificate of Service**

I hereby certify that on June 11, 2007
a true and correct copy of the foregoing was
electronically mailed to the following:

Patrick Gilmore
acgef@acglaw.com, pbg@acglaw.com, dap@acglaw.com.

Marion Walker
mfwalker@fordharrison.com, mwilkens@fordharrison.com, dbivins@fordharrison.com.

Randy Weddle
rweddle@hwb-law.com,          bfontaine@hwb-law.com,          jekstrand@hwb-law.com,
kwarne@hwb-law.com.


s/ Michael T. Stehle
Michael T. Stehle

PLAINTIFF'S RESPONSE TO OFC'S MOTION FOR RECONSIDERATION
Case No. A01-0011 CV (JWS)
Page 17 of 17