Reeves, Kristie

**From:** Mascia, Lawrence
**Sent:** Wednesday, April 23, 2003 8:00 AM
**To:** Ashcraft, Glen
**Subject:** FW: AT Publishing --11 AM Pacific Time

Glen,
You mentioned yesterday on the telephone Ray Seward has had two trips to Anchorage since the installation why does Garrett believe 95% of the problems are operational and training related?

-----Original Message-----
**From:** MacKenzie, Scott
**Sent:** Tuesday, April 22, 2003 2:03 PM
**To:** Mascia, Lawrence
**Subject:** FW: AT Publishing --11 AM Pacific Time

FYI

-----Original Message-----
**From:** Garrett, Randy
**Sent:** Tuesday, April 22, 2003 1:20 PM
**To:** James, Dennis
**Cc:** Taylor, Ben; Ashcraft, Glen; Domrese, Gary; Newton, Ken; MacKenzie, Scott; Yerkes, James; Andersen, Randy; Murdock, Mike; Garrett, Randy
**Subject:** AT Publishing --11 AM Pacific Time

I believe I have copied in everyone interested in the 4995/2340 placement in this account in Anchorage.
Things have changed there rather dramatically in the last few minutes. I have been on and off the phone most of the morning planning to send a technician from Seattle to work with this account next week. I was putting together a final plan to address their service issues. I can tell you that their service issues are about 5% of the problem. The other 95% of their issues being operational and training issues. Be that as it may everything has now changed.
Last night - one of their operators-Clint Sayer---who is the guy that Ray Seward trained this past week---dropped an allen wrench into the impression cylinder between the first and second towers. This came to me in the conversation I was having with Frank Martone--the owner--as I was making final arrangements. I then talked to one of the son's--Andy Martone--production mgr--he says the machine is not runnable--they have taken it off line--there is an impression of this allen wrench in the impression cylinder--it is a large marking. Frank Martone has contacted his insurance company. Clint Sayer-operator-- has been sent home - I am not sure of his employment status at their company.
In conclusion----Frank Martone has requested that nothing be done at this time until he hears what to do from his insurance company. There will be a very, very large amount of work needed for that machine to run. We are on hold until we now here back from the customer. I have canceled the trip for next week. Jim Yerkes and Gary Domrese are in the loop by phone about this matter in the past 30 minutes.
Randy Garrett
NW District Service Mgr.

1




ABD    20

ATTACHMENT 4, Pg 1
57

**FREEDOM COURT REPORTING**

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ALASKA
 3
 4   AT PUBLISHING, INC.,
 5        Plaintiff,
 6
 7   vs.          Case No. A04-0011 CV (JWS)
 8
 9   A.B. DICK COMPANY, and OFC CAPITAL, a division of
10   ALFA FINANCIAL,
11        Defendants.
12   ------------------------------------------------
13
14        VIDEOTAPED DEPOSITION OF GLEN ASHCRAFT
15            TAKEN ON BEHALF OF DEFENDANTS
16                 FEBRUARY 20, 2006
17
18   - - -
19   BE IT REMEMBERED THAT, pursuant to the Federal Rules
20   of Civil Procedure, the videotaped deposition of GLEN
21   ASHCRAFT was taken before Laurie A. Volker,
22   Registered Professional Reporter, on August 25, 2005,
23   commencing at the hour of 10:00 a.m., the proceedings
24   being reported at 111 SW 5th Avenue, Suite 3400,
25   Portland, Oregon.
```

(COPY stamp)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

*ATTACHMENT 4, Pg 2*

```
 1        Q.   -- administrative person; right?
 2        A.   Right.
 3        Q.   And she pulled these e-mails off and put
 4   them in a file; correct?
 5        A.   Right.
 6        Q.   And this is your file that we're going
 7   through?
 8        A.   Right.
 9        Q.   And so I show you this exhibit and ask you
10   if you recall seeing the e-mail at the time, April 23
11   of '03, from Randy Garrett describing the fact that
12   the Allen wrench had been dropped in the press?
13        A.   Yes.
14        Q.   Okay.
15        A.   And I sent this on to my vice president,
16   Larry Mascia, who then answered back that he -- Ray
17   Seaward had made two trips to Anchorage since the
18   installation, and then why does Randy Garrett believe
19   95 percent of the problems are operational and
20   training related.
21        Q.   That was the cut -- he was asking the
22   question?
23        A.   Right.
24        Q.   Why does Randy think that?
25        A.   Right.
```

```
 1        Q.   Okay.  Who is Larry Mascia?  M-a-s-c-i-a.
 2        A.   Larry Mascia was vice president of sales.
 3   My boss.
 4        Q.   Your boss?
 5        A.   Right.
 6        Q.   Okay.
 7             And did you understand, Glen, and had you
 8   weighed in with an opinion as to what the problem was
 9   at AT Publishing, as to whether it was operational or
10   whether it was equipment related?
11             MR. GRISHAM:  Objection.  Assumes facts not
12   in evidence.  Lack of personal knowledge.
13   BY MS. WALKER:
14        Q.   You can answer.  I'm asking if you did or
15   not.
16        A.   No.  I didn't determine that.  That was
17   determined by others.
18        Q.   Okay.  You only know what was being passed
19   through the e-mails; is that right?
20        A.   Correct.
21        Q.   And you were in the loop to the extent the
22   information was out there; is that right?
23        A.   Correct.
24        Q.   Did you ever actually go to Anchorage and
25   to AT Publishing?
```

```
1         A.    Not during this period.
2         Q.    Okay. And the people who went were Ray
3    Seaward, Mike Murdock, and Burt Green, and other
4    folks whose names appear on the documents; right?
5         A.    That's correct.
6         Q.    And how about Chris Koke? K-o-k-e.
7         A.    Could have. I'm not sure.
8         Q.    What was his function at A.B. Dick?
9         A.    He was another specialist on the 4-color
10   press.
11        Q.    Okay. Did he do installations?
12        A.    Yes.
13        Q.    Okay.
14        A.    He did the ones in Los Angeles and other
15   places. He's headquartered in Los Angeles.
16        Q.    Okay. All right. Well, let me show you
17   Defendant's Exhibit 24. This is Bates No. A.B. Dick
18   25.
19              (Whereupon Exhibit-24, a 1-page e-mail
20   dated 4-11 & 4-15-03, was marked for identification.)
21   BY MS. WALKER:
22        Q.    And this is an e-mail stream, too, once
23   again showing Kristie Reeves at the top, and -- but
24   it's also -- maybe I've already introduced this.
25   This is one with Ken Newton. I'm afraid I have.
```

1    A.    You have.
2    Q.    Yeah.  This is just a copy.  This is the
3  one from Ken Newton when he got the e-mail, so I will
4  remove that sticker.
5         Now, I want to go back to that, because at
6  the top -- actually, I see why I did it.  I'm going
7  to put that on there again.
8         This is a different e-mail where Ken Newton
9  is writing to -- or you're writing to Ken Newton, I'm
10 not sure which, just had your name down there at the
11 bottom.  Does that mean you're writing Bates No. 25
12 of A.B. Dick to Ken Newton and Brian Lange?  But I
13 thought this was an e-mail that you sent that you had
14 talked with Ray Seaward, the trainer at
15 AT Publishing -- this is in April -- to find that
16 things were going a lot better because they had
17 gotten a good pressman.
18   A.    Yes, that's correct.
19   Q.    Did you have that conversation with Ray?
20   A.    Yes.
21   Q.    Okay.  And you're looking there at the
22 e-mail.  Does that refresh your recollection of what
23 was said in the conversation?
24   A.    Yes, in that it appeared they needed more
25 help on the digital plate maker, and Marcus Hart was

```
 1  going to fit into that, and Ray Seaward would --
 2      Q.   Ray Seaward was already up there at the
 3  time?
 4      A.   Right.  So Marcus Hart fit into the part on
 5  the digital plate maker because it was determined
 6  they really weren't up to speed on the digital plate
 7  maker.
 8      Q.   So Ray Seaward was recommending additional
 9  training on the DPM; right?
10      A.   Correct.
11      Q.   And did Ray Seaward say the training was
12  going better that second week of training than the
13  first?
14      A.   Yes.
15      Q.   And why was that?
16      A.   Well, because he had taken his son off the
17  press and given it to a good pressman.
18      Q.   Had a good pressman on it?
19      A.   Right.
20      Q.   Okay.  And when you say, "he," who are you
21  talking about?  Frank?
22      A.   Frank.
23      Q.   Frank Martone.  All right.
24           All right.  Looking over my notes here.
25  Did anybody from AT Publishing ever talk to you other
```

```
 1  than Frank Martone?
 2      A.  No.
 3      Q.  Did Frank ever tell you during any
 4  discussion that his company already had some
 5  experience with plate making?
 6      A.  No.
 7      Q.  Did you ever ask him about that?
 8      A.  No.
 9      Q.  That really wasn't your part in this sale
10  at all, anyway, was it?
11      A.  Right.
12      Q.  Okay.
13          Now, just once again so I know this is
14  clear, did anyone at AT Publishing ever tell you they
15  were rejecting this equipment?
16      A.  No.
17      Q.  All right.
18          MS. WALKER:  I understand you thought -- we
19  could -- we can wait until later, but I feel like I
20  need to offer Exhibits 17-24, Defendants' exhibits,
21  and if you want to wait for a ruling later, that's
22  fine.
23          MR. GRISHAM:  Well, they're proposed trial
24  exhibits, and we reserve the right to make any
25  objections to all exhibits purportedly offered at the
```

```
 1   appropriate time.
 2           MS. WALKER: Well, I understand, but so far
 3   as my needing to have this witness present to discuss
 4   these, I'd like, you know, any issues you have with
 5   them at this point.
 6           MR. GRISHAM: Marion, that doesn't make any
 7   sense. You can show him the exhibits, you can try to
 8   have him -- you know, ask him any questions necessary
 9   in order to authenticate the exhibits and ask him
10   whatever questions you want, and whether they're
11   admissible or not is a different question entirely.
12           So you've had the opportunity to ask him
13   everything you need to ask him, and that's fine. And
14   you've had the opportunity to have him identify
15   things, and that's fine. And when it's time to
16   submit exhibits, we'll argue over admissibility.
17           MS. WALKER: Well, you know, if you're not
18   objecting to authentication here, then that's fine.
19   I mean, if you are going to --
20           MR. GRISHAM: I'm not saying whether
21   they're authenticated or not. What I'm telling you
22   is you've had the opportunity.
23           MS. WALKER: Okay. Well, then, I'm going
24   to ask another question, then.
25   BY MS. WALKER:
```

**FREEDOM COURT REPORTING**

Page 42

1   Q.   I'd like for you to look at these exhibits
2   that I have given you, Glen, and tell me whether or
3   not these documents were kept in the ordinary course
4   of business by A.B. Dick through Kristie Reeves or
5   whomever?
6   A.   They were.
7   Q.   All right.
8        MS. WALKER:  Your witness.
9   EXAMINATION
10  BY-MR.GRISHAM:
11  Q.   Mr. Ashcraft, first of all, would you like
12  to take a break?
13  A.   I'm fine right now.
14  Q.   Okay.  I hate to interrupt anybody's
15  retirement, so I'll try to keep this as brief as I
16  can.
17  A.   Thank you.
18  Q.   So you've given us some background
19  generally regarding your background in the industry
20  with Multigraphics and with A.B. Dick.
21       Now, I just want to get that clear on this.
22  You said you worked for Multigraphics for
23  approximately 30 years in the Portland area; is that
24  correct?
25  A.   43 years total, and 30 years in the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

ATTACHMENT 4, Pg 10