# FREEDOM COURT REPORTING

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4   AT PUBLISHING, INC.,
 5        Plaintiff,
 6
 7   vs.          Case No. A04-0011 CV (JWS)
 8
 9   A.B. DICK COMPANY, and OFC CAPITAL, a division of
10   ALFA FINANCIAL,
11        Defendants.
12   ---------------------------------------------------
13
14        VIDEOTAPED DEPOSITION OF GLEN ASHCRAFT
15           TAKEN ON BEHALF OF DEFENDANTS
16                 FEBRUARY 20, 2006
17
18   - - -
19   BE IT REMEMBERED THAT, pursuant to the Federal Rules
20   of Civil Procedure, the videotaped deposition of GLEN
21   ASHCRAFT was taken before Laurie A. Volker,
22   Registered Professional Reporter, on August 25, 2005,
23   commencing at the hour of 10:00 a.m., the proceedings
24   being reported at 111 SW 5th Avenue, Suite 3400,
25   Portland, Oregon.
```

(stamped: COPY)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Attachment 5 Pg 1

**FREEDOM COURT REPORTING**

```
 1   APPEARANCES
 2
 3   MICHAEL GRISHAM, ESQUIRE (Via telephone)
 4   Dorsey & Whitney, LLP
 5   1031 West 4th Avenue, Suite 600
 6   Anchorage, Alaska 99501
 7   907.257.7829
 8   Appearing on behalf of AT Publishing
 9
10   MARION F. WALKER, ESQUIRE
11   Ford & Harrison
12   2100 Third Avenue, Suite 400
13   Birmingham, Alabama 35203
14   205.244.5916
15   Appearing on behalf of OFC Capital
16
17   Also present:   Frank Martone
18                   Travis Shields, Videographer
19
20
21
22
23
24
25
```

**FREEDOM COURT REPORTING**

Page 62

```
 1        Q.   Were you familiar with that national
 2   marketing program?
 3        A.   Only by the representation of OFC coming to
 4   our meetings and that type of thing.
 5        Q.   Were you directed to encourage customers to
 6   use OFC for its -- for their financing?
 7        A.   No.  We had three choices.
 8        Q.   What were those choices?
 9        A.   Two leasing companies out of New York, and
10   OFC Capital.  I don't recall the -- Compelco might
11   have been one, and I can't remember the names of the
12   other companies.
13        Q.   Was the majority of your customer financing
14   done by OFC at that time?
15        A.   It was.
16        Q.   Was it the vast majority?
17        A.   Usually it was determined by the customer
18   in their preference of who they wanted to do business
19   with or had a past history of doing business with.
20        Q.   But were most of your customers using OFC
21   at that time?
22        A.   A good percentage.
23        Q.   Can you give me what that percentage would
24   have been?
25        A.   I can't.  It would be a guess, but I would
```

**FREEDOM COURT REPORTING**

Page 63

```
 1   say at least --
 2           MS. WALKER:  We'd object to guessing.
 3   BY MR. GRISHAM:
 4       Q.  Go ahead and answer.
 5       A.  -- 50 to 60 percent.  Something like that.
 6   And that would be of leasing agreements, not of net
 7   deals, and that kind of thing.  But speaking strictly
 8   of leases.
 9       Q.  Okay.
10           MS. WALKER:  Move to exclude.
11   BY MR. GRISHAM:
12       Q.  Going down in our enormous stack of
13   interesting documents we have for you, could you pull
14   out the document 0188 OFC/ATP, and it's labeled,
15   "Vendor Prefund Agreement."
16       A.  Yeah, I have that.
17       Q.  Okay.  Could you hand that to the court
18   reporter for marking.
19           (Whereupon Exhibit-6, a 4-page document
20   entitled, "Vendor Prefund Agreement," was marked for
21   identification.)
22           MR. GRISHAM:  And before we get into that
23   document, I'm also going to be asking, I don't
24   believe that -- Marion, you can correct me if I'm
25   wrong -- I don't believe this particular document is
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Attachment 5 pg. 4

1   A.  That's correct.  The function is usually
2   handled by our service -- Ray Seaward worked for me,
3   but he coordinated through Randy Garrett and the
4   service department, so the main contacts would have
5   been through our service organization.
6   Q.  So you never heard from Ray Seaward or Burt
7   Green while they were doing training at AT Publishing
8   that -- any complaints regarding the skills or
9   abilities of the trainees?
10  A.  No, I did not.
11  Q.  Now, you were talking earlier about
12  conversations with Frank Martone, and you established
13  that Frank didn't really complain to you about the
14  press; is that correct?
15  A.  That's correct.
16  Q.  Did you -- would you have expected Frank to
17  call you or speak with you directly about the press?
18  A.  I would imagine if it was a big enough
19  issue, he would have, yes.
20  Q.  Well, given your past dealings with Frank,
21  was Ben Taylor the one who was mostly in charge of
22  handling customer relationships with AT Publishing on
23  this press?
24  A.  Correct.
25  Q.  So you would normally expect that, you

```
 1  know, customer conversations would go through him or
 2  go through people working with him?
 3          MS. WALKER:  Object to form.  Object to
 4  "normally."
 5  BY MR. GRISHAM:
 6      Q.  If you can answer.
 7      A.  Correct.
 8          MS. WALKER:  Move to exclude.
 9  BY MR. GRISHAM:
10      Q.  So when you were -- when -- at the same
11  time you mentioned you talked to Frank in order to
12  give him references with respect to the 4995 press.
13          Do you know when that conversation took
14  place?
15      A.  I don't have it in front of me.  I don't --
16  no, I don't.
17      Q.  Was it a written letter or a fax that went
18  back?
19      A.  It was a fax that I sent indicating the
20  names and the contact people for him to contact.
21      Q.  Okay.  Did you actually have an oral
22  conversation with Frank that led to this fax?
23      A.  Yeah.  I think I had called, and the
24  conversation got to, could you give me some
25  references, and that's what I did.
```

**FREEDOM COURT REPORTING**

Page 69

```
1       Q.   Do you recollect whether this was during
2  the time period when you were organizing the sale of
3  the 4995 press to Frank?
4       A.   No.  I think it was after.
5       Q.   Okay.  You said that you gave him the names
6  of some well-satisfied customers.
7       A.   Right.
8       Q.   And why did you pick such customers?
9       A.   Because they were well satisfied.  That was
10 our customer base, too.  That was what we were
11 looking at at the time.  Those were our installations
12 that were more in accord with what he was looking
13 for.
14      Q.   You spoke of a competitor's salesperson
15 arriving at a Denver customer's office earlier.
16           Do you have any personal knowledge at all
17 regarding what was said by this salesperson to this
18 Denver customer?
19      A.   I do not.
20      Q.   Do you have any personal knowledge
21 regarding how this sales competitor got any knowledge
22 of the 4995 press?
23      A.   I don't personally have that knowledge, no.
24           MS. WALKER:  We've just received the
25 documents, Mike.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Attachment 5 pg. 7